## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **JOSEPH MAAS** | : | **Civil Action No.   1:23-cv-00076** |
| **c/o Jacobs, Kleinman, Seibel & McNally** | : | |
| **30 Garfield Place, Suite 905** | : | **Judge** |
| **Cincinnati, Ohio  45202** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **-vs-** | : | |
| | : | **COMPLAINT WITH JURY DEMAND** |
| **JTM PROVISIONS COMPANY INC.** | : | |
| **200 Sales Drive** | : | |
| **Harrison, Ohio  45030** | : | |
| | : | |
| **SERVE:** | : | |
| **CT Corporation, Registered Agent** | : | |
| **50 West Broad Street, Suite 1330** | : | |
| **Columbus, Ohio  43215** | : | |
| | : | |
| **and** | : | |
| | : | |
| **ANTHONY A. MAAS** | : | |
| **3277 Cherryridge** | : | |
| **North Bend, Ohio  45052** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JOHN T. MAAS, JR.** | : | |
| **15134 Latimer Road** | : | |
| **Moores Hill, Indiana  47032** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JEROME T. MAAS** | : | |
| **8411 Macy Lane** | : | |
| **Cleves, Ohio  45002** | : | |
| | : | |
| **Defendants** | : | |

Now comes Plaintiff Joseph R. Maas ("Joe") and hereby submits his Complaint against Defendants JTM Provisions Company, Inc. ("JTM"), Anthony A. Maas ("Tony"), John T. Maas, Jr. ("Jack"), and Jerome T. Maas ("Jerry") and states as follows.

### Jurisdiction and Venue

1. This case arises under Title VII, 42 U.S.C. §2000e et seq. Specifically, jurisdiction rests in this Court for Joe's federal claims under 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §1331. The Court's supplemental jurisdiction over Joe's state law claims is based upon 28 U.S.C. §1367(a).

2. Venue is proper in the Southern District of Ohio, Western Division, pursuant to 28 U.S.C. §1391(2) as a substantial part of the events giving rise to the claims occurred in this judicial district.

### The Parties

3. Joe is a minority shareholder and former employee of JTM. Joe owns or controls 25% of the voting stock of JTM. Joe is a voting member of the JTM Board of Directors ("Board"). Joe was terminated by the Defendants without cause from his employment at JTM on February 12, 2021.

4. JTM is a food processing company based in Harrison, Ohio. It is a closely held corporation organized and existing under the laws of the State of Ohio. It is a Sub S corporation. It is also an employer as that term is defined under Ohio Revised Code §4112.01 et. seq.

5. Tony is a JTM shareholder and a voting member of the Board. Tony serves as President and CEO of JTM. Tony is an employer as that term is defined under Ohio Revised Code §4112.01. Tony owns or controls 25% of the voting stock of JTM.

6.      Jack is a JTM shareholder and a voting member of the Board.   Jack also serves as Chairman of the Board.  Jack is an employer as that term is defined under Ohio Revised Code §4112.01.  Jack owns or controls 25% of the voting stock of JTM.

7.      Jerry is a JTM shareholder and a voting member of the Board.  Jerry serves as the Vice President of JTM.  Jerry is an employer as that term is defined under Ohio Revised Code §4112.01.  Jerry owns or controls 25% of the voting stock of JTM.  Throughout the complaint, Tony, Jack, and Jerry are also hereinafter collectively referred to as the "Controlling Shareholders".

## Factual Background

8.      JTM is a food processing business that was incorporated under the laws of the State of Ohio on or about March 4, 1974.

9.      On or about July 23, 2010, a Buy-Sell Agreement was executed by the shareholders in which it was memorialized that Tony, Jack, Joe, and Jerry equally owned or controlled all outstanding shares of common stock in JTM.

10.      Pursuant to the Buy-Sell Agreement, the Controlling Shareholders collectively maintained or controlled 75% of the outstanding shares of common stock in JTM; and Joe maintains or controls no more than 25% of the common shares.

11.      Throughout his tenure as President, Tony, along with his brothers, Jack and Jerry, have imposed their religious convictions upon Joe by forcing him to make charitable donations predominantly in favor of the Catholic religion as directed by the Controlling Shareholders and demanding HR commit to tithing 10% of his earnings.

12.      Tony, along with Jack and Jerry, have forced JTM to maintain a charitable contribution program that has personally benefited Tony, with little to no benefit to JTM.  The

3

amount of charitable contributions directed by Tony, Jack, and Jerry have also been financially detrimental to Joe.

13.     Prior to 2017, and through the actions of the Controlling Shareholders, JTM was forced to contribute approximately 10% of its yearly pre-tax net profit to predominantly Catholic charitable organizations.  The basis for this requirement is Tony's religious belief that a 10% donation of a tithe is demanded by God as required under the Bible.  Furthermore, according to Tony, JTM's failure to tithe 10% of JTM's pretax profits will offend God and cause the business to fail.  Tony's zealotry is such that he has demanded his family, Jack's and Jerry's families execute a document titled "JTM Charitable Family Agreement" ("Charitable Charter"). (Attached as Exhibit 1).  In the document, each of the signatories agrees to dedicate themselves to Jesus and his church and pledge 10% "of our first fruit, net income, to tithing" and God.  Yet, Tony, Jack and Jerry do not tithe their money, but tithe JTM's money as their own.  Joe refused to sign Tony's Charitable Charter which angered Tony and later motivated to Joe's termination from JTM by the Controlling Shareholders.

14.     Joe supported and continues to support a reduced charitable giving program at JTM; however, he believes that contributing charitable donations annually at a 10% of pre-tax net profit level in order to satisfy Tony's religious convictions of tithing, coupled with several hundred thousand dollars in food donations each year, is excessive and serves no legitimate corporate purpose for a successful food processing company.  Joe has opposed the Controlling Shareholders' charitable giving level to predominately Catholic recipients as excessive and discriminatory.

15.     The financial significance of this Charitable Donation Program upon Joe as a minority shareholder in a closed, Sub S corporation, is that 25% of JTM's pre-tax net profits that would otherwise be distributed to him or his trusts, are diverted from his distribution by the

4

Controlling Shareholders to third party charities that are predominantly Catholic in the name of tithing and the belief that the monetary donations will secure their place in heaven.

16.     In 2015 and 2016, the amount of charitable cash contributions made by JTM to third party organizations equaled $1.5 million for 2015, and $2.5 million for 2016.  Twenty-five percent of these amounts, which otherwise would have been distributed individually to Joe, is over $1.5 million dollars.  These contributions were made within the last six years and mostly directed by Tony.

17.     In November of 2016 through February of 2021 Joe met with his brothers Tony, Jack, and Jerry on numerous occasions.  During this period, Joe told his brothers that he did not want them imposing their Catholic charity donation tithing requirements upon him.

18.     On or about November 25, 2016, Joe formally objected to the amount of JTM's annual cash charitable contributions directed by Tony because such contribution levels served no legitimate business purpose; they were based upon Tony's religious preference, and were discriminatory towards Joe.

19.     In December of 2016, the alleged independent members of the JTM Board expressed the opinion that the charitable contribution level directed by Tony, and based upon tithing in favor of various Catholic organizations and charities, was excessive.  In a December 12, 2016 email, John Sullivan, a JTM Board member, wrote to Jim Berding and Greg Sykes, two other Board members and stated:

> With all that being said, i think the best solution is to give the 9% to the three shareholders and give Joe his 9% to do with as he wishes.  These would be distributions and not be on the financial statement. The in kind would need to be tracked as a line item on the P&L and held to a budgeted not to exceed number.  Joe's number of $120,000 is too low.
>
> My reasoning in addition to Jim's summary:

- The company will still be viewed as being very generous by employees and the community. I don't think they track percentages. This is a considerable amount of money.
- I would ask Jack but according to Joe his Father did not tithe.
- The three shareholders would still be giving 10%, which could satisfy their moral commitment.
- I think Joe has a legitimate complaint on who Tony has tracked giving.
- I support over ruling a shareholder on capital contributions but I don't think we should force a shareholder to make a charitable contribution.

(Attached as Exhibit 2)

20.     Nevertheless, on December 20, 2016, the JTM Board, dominated by the Controlling Shareholders, passed a Resolution (by a 5-1-1 vote) which mandated JTM continue to contribute 10% of JTM's pre-tax net profit to various charities (1% in kind and 9% in cash) with 75% of the charitable contributions going to the Maas Family Foundation as long as Joe resigned from the Maas Family Foundation Board ("December 2016 Resolution"). The December 2016 Resolution, prepared by JTM's corporate attorney at Tony's direction, also forced Joe to form a private charitable foundation at his expense and against his wishes. The remaining 25% of JTM's charitable contributions would then be distributed to this newly formed private foundation with Joe contributing his proportionate share of the charitable contributions to this private foundation against his wishes. Joe was the only Director who voted against the December 2016 Resolution because the charitable contribution level was excessive for a food processing company, it imposed upon him Tony's religious belief of tithing, and he had no desire to involuntarily form and fund a private foundation at his expense. The JTM Board (with Mr. Berding abstaining), dominated by the Controlling Shareholders, compelled Joe to do so.

21.     Tony's discriminatory animus is highlighted in an email dated December 21, 2016 that he sent to the Controlling Shareholders and JTM's Board wherein he indicated his

dissatisfaction with Joe in refusing to voluntarily provide financial support consistent with Tony's

Catholic religious convictions.

> "Pray today. With much prayer and reflection, there is no way we can not continue tithing the way we have. It is very heavy The Lord has blessed us mighty through our faithfulness. This is a undeniable fact. I also believe our Lord would bless us if we had to defend this in the court of law, to become a positive for us to showcase our faithfulness. To stop tithing now would be the worst decision in the history of our business and would cause irreparable harm to our business and our family. Tithing is or should be our sacred bond our accountability one another. It is what strengthens us and unites us. It is who we are. You can not prove that is not a fact. In a court of law. But most importantly to our family employees customers and community and charities. All that said if jack jerry and myself our kids and my sister and kids can sign our catholic charitable charter that we forever will give our first fruits to the Lord. There may be a way to except joe proposal. Charitable giving would have to stay in line item on our income statement however it would by only 75 percent of the 9 percent. Plus joe 120,000. Joe would get a bonus paycheck for the difference, in my heart of hearts I pray he would give to charity. The language he uses from lawyer no way to use. The language that states how bad and mismanagement there is. I pray this is not where it lands. I pray his 3 kids would sign also our commitment to tithing and thus he to. Pray today JTM is not just a business it is our calling here on earth form our Lord to serve Him and His church. Our Lord is counting on us. We are forever counting on Him. I love you all please know this. This is not a business decision. This is life or death. Know God know peace. No God NO peace." (Emphasis added)

(Attached as Exhibit 3)

22. Gregory Sykes, a JTM Board member, responded to Tony's email by stating:

> "The Lord has answered our prayers. You have laid out the winning solution in the paragraph below. After you have converted this to a Board Resolution, we should submit to the Board and vote." (See Exhibit 3)

23. Due to Joe's continued objection to the 10% pre-tax tithing contribution, the Board reluctantly passed a corporate resolution on February 9, 2017 limiting JTM's annual charitable contributions to a maximum of two percent (2%) of its pre-tax net income, as well as excluding certain other items as constituting a charitable contribution ("February 2017 Resolution"). (A copy of that resolution is attached as Exhibit 4.)

7

24.    Specifically, the February 2017 Resolution stated in relevant part:

2.    <u>Community Marketing Expenditures</u>:  The Company is authorized to maintain expenditures of certain marketing dollars with various charitable organizations to support the Company's standing as a "good corporate citizen" in the Greater Cincinnati community, within the limit set forth in Section 5 below.

3.    <u>Cash Charitable Contributions</u>:    On behalf of the Company's shareholders, the Company is authorized to make cash and other charitable contributions to various charitable organizations and institutions, within the limit set forth in Section 5 below.

4.    <u>Other Charitable Giving</u>: As necessary, the Company is authorized to enter into other charitable transactions, either in the form of cash or non-cash, within the limit set forth in Section 5 below.  If the transaction is non-cash in nature, the Company CFO will assign a fair market value to it.  The Company CFO will make the final determination whether any such charitable transaction, cash or noncash, constitutes a charitable contribution.

5.    <u>Total Charitable Contributions Affecting Shareholder Distributions</u>:  The total charitable contributions, in the form of cash or some other transaction, thereby affecting the Company's shareholders' distributions, under Sections 2, 3 and 4 above, will not exceed, on an annual basis, two percent (2%) of the Company's pre-tax net income, as determined by the Company's CFO. JTM's payment of expenses for the maintenance and upkeep of The Underground Building ("The Underground Building"), located at 1140 Smiley Avenue, Cincinnati, Ohio  45240, which is owned by an affiliate of JTM, Maas Enterprises, Ltd. as well as JTM's payment to independent contractor Richard Hammersmith, shall not be included within the aforementioned two percent (2%) limitation.

9.    <u>Authority</u>:  Anthony A. Maas, Jerome T. Maas, John T. Maas and Joseph R. Maas shall each designate 25% of the amount of contributions [the 2% of pre-tax net profit] made Section 2, Sections 3 and 4 above. (See Exhibit 4)

25.    Immediately upon passage of the February 9, 2017 Resolution limiting corporate contributions to a total of 2%, the Controlling Shareholders wrote to the Board as follows:

We are extremely proud of the long time commitment of charitable giving, tithing, at JTM.  <u>Catholic charity is embodied in our company culture and mission that serves to unify our families and motivate our success throughout the business.</u>

> We strongly believe in our charitable mission. As a result, Jack, Tony, Jerry and their families have taken steps to continue tithing at the shareholder level in the manner previously undertaken at the Company level.
>
> We are deeply saddened by recent events and have reluctantly signed our names to this resolution that removes tithing from JTM. Despite our belief otherwise, the sole reason leading to this resolution is our desire to eliminate the immense disruption to our business resulting from this conflict. Our focus must remain squarely on the massive responsibility we have to our employees, our customers, our shareholders, our communities and our charities, as it always has been. (Emphasis Added)

(Attached as Exhibit 5)

26.     Consequently, with the passage of the February 9, 2017 Resolution, Tony, Jack, and Jerry agreed among themselves to continue to personally contribute at the 10% tithing level with 2% of their contributions being made from JTM and the remaining 8% from their personal wealth after their shareholder distributions. These individual donations by Joe's brothers were made primarily to Catholic organization and charities.

27.     On November 17, 2017, Joe filed a derivative shareholder suit on behalf of JTM against the Defendants for claims of self-dealing, breach of fiduciary duties and other illegal activities. The lawsuit was filed in the Court of Common Pleas of Hamilton County and designated Case No. A1705836. Joe was prohibited by the Court from pursuing any individual claims in the lawsuit.

28.     On August 28, 2019, Judge Patrick Foley granted summary judgment on behalf of Defendants and dismissed the derivative lawsuit. Judge Foley's decision was appealed to the First District Court of Appeals which affirmed the summary judgment decision on November 4, 2020, in Case No. C-190536.

29.     In October of 2020, Joe moved the JTM Board to discontinue JTM's payment for Tony's annual Reds Dream Week in Phoenix, Arizona.  Joe complained that although Tony takes a JTM employee with him on the trip, it is limited to "male only employees".  Joe complained that:

> this extravagant perk has been made available only to male employees. Several female employees have remarked that they feel slighted because Tony only makes extravagant team building perks available to males. Today, when diversity is at the top of the Nation's thoughts, offering an entertainment perk only available to males is dangerous and downright illegal.

(Attached as Exhibit 6)

30.     In an email string dated December 2020, Joe complained to Matthew Montgomery ("Montgomery") as JTM's CFO, that he was forcibly withholding Joe's pre-tax shareholder distribution at the direction of the Controlling Shareholders in order to make additional funds available for an anticipated charitable contribution as directed by Tony and based upon Tony's tithing belief.  (Attached as Exhibit 7)   Instead of using their personal funds to tithe, the Controlling Shareholders used JTM funds including a percentage of funds that would otherwise be distributed to Joe.  In that way, they believed they were currying God's favor.

31.     On February 6,  2021, Joe met with his brothers Tony, Jack, and Jerry.  At the meeting, Jack read from a prepared statement that they wanted Joe to voluntarily leave JTM.  One of the reasons articulated by Jack was because Joe did not agree with some of the decisions made by Tony as President of JTM.  Joe refused to voluntarily resign in part because he opposed Tony's tithing requirement and beliefs.  The meeting lasted less than three minutes.

32.     Immediately after the February 6, 2021 meeting, Jerry sent an email to Joe with a proposed Settlement Agreement and General Release ("Settlement Agreement') requesting that Joe resign from JTM by February 12, 2021.  A copy of the Separation Agreement and Release is

attached as Exhibit 8. In paragraph 9 of Settlement Agreement, Joe was advised to consult with

an attorney and given 21 days in which to review and consider the Settlement Agreement.

33.     Joe sought a meeting with legal counsel on February 11, 2021. At that time, legal

counsel sent an email to Montgomery which stated:

> I apologize for the informal nature of this communication, however, I am leaving town and wanted to get this information to you this afternoon. I represent Joe Maas in regard to the Separation Agreement and General Release document that was presented to him this past week. I understand that the Company wishes for Mr. Maas to resign his employment. Joe is refusing to resign at this time. The Separation Agreement and General Release advises him to consult with an attorney regarding this document. Joe has asked that I review the document and meet with him next week and discuss the issues, if any, that may exist within this Agreement. In the meantime, it is my understanding that because Joe has not been terminated, he intends to continue to report to work as he has done over the last 40 years. Should you have any questions, please do not hesitate to contact me.

(Attached as Exhibit 9)

34.     After suggesting that Joe consult with legal counsel, and upon receipt of an email

from Joseph's counsel, Montgomery sent a letter early morning the following day of February 12,

2021 to Joe. In the letter, Montgomery wrote in part:

> Your employment with JTM Provisions Company, Inc. ("JTM") has been terminated effective immediately. The written offer provided to you on February 6, 2021 was rejected by your counsel. For purposes of clarity and to the extent legally necessary, any written or verbal offer communicated to you prior to this letter is hereby unconditionally revoked, effective immediately.
>
> Effective immediately, you are no longer authorized to access any land owned or leased by JTM without the express, prior written permission of the President of JTM, Tony Maas. Please accept this letter as written notice to you under Section 2911.21 of the Ohio Revised Code.
>
> As a result of the termination of your employment, you are no longer legally authorized to enter into agreements or sign on behalf of JTM. You may not represent to anyone that you are employed by or act on behalf of JTM

> without the express prior written consent of the President of JTM, Tony Maas.
>
> Your authorization to access JTM's computers and networks is also hereby revoked. Please be advised that the Computer Fraud and Abuse Act, 18 U.S.C. §1030, prohibits intentionally accessing a computer without authorization to obtain information from a protected computer.
>
> . . .
>
> I received a communication from your attorney, Mark Byrne, on February 11, 2021. As a result, I am directing a copy of this letter to his attention. By copy of this letter, I am directing Mr. Byrne to direct all further communications with respect to the termination of your employment to JTM's outside counsel, Brian O'Connor, Esq. at pbo@santenhughes.com.

(Attached as Exhibit 10)

35.     Thus, after working for JTM for over 45 years and being instrumental in building it into a multi-million dollar national corporation, Joe's three brothers, in wielding their majority shareholder power, terminated Joe from his employment based in part due to his refusal to agree to tithe part of his shareholder distributions based upon the Controlling Shareholders' Catholic faith, and because of his opposition to Tony's gender discrimination.

36.     Joe also opposed re-implementing the 10% JTM pre-tax charitable giving tithing policy by the Controlling Shareholders. Specifically, by raising to 10% the JTM pre-tax charitable contribution level, it would obligate Joe to contribute an additional 8% of his pre-tax net profit to primarily Catholic charities at the choosing of Tony. The increase from 2% to 10% also reduced the individual charitable contributions of 8% being made by the Controlling Shareholders since 2017 and replaced their individual contributions by increasing the pre-tax contribution level for Joe from 2% to 10%.

37.     Subsequently, on February 18, 2021, JTM passed a Corporate Charitable Giving Program at the insistence of Tony, Jack, and Jerry.   This Resolution was passed over Joe's objection.  It states in relevant part:

> WHEREAS the Company desires to continue the legacy of J.T.M. and the Maas family of providing support to charities and community organizations in accordance with their Catholic faith through tithing:
>
> WHEREAS the Company desires to support the following five critical giving categories:
>
> 1.      First and foremost is the **education** of the faith through vocations, schools, parishes, catholic education ministry.  The natural outcome of being properly formed in your faith is help social justice causes that are handups not handouts that adhere to the principals of the catholic faith.
>
> 2.      Helping the **needy**, the impoverished with self-sustaining needs such as food, shelter, clothing and education.
>
> 3.      **Medically** impaired.  To help those either physically or mentally handicapped, elderly, or injured in military service through life sustaining and life dignifying means such as medical care that is needed or a more comfortable living ability or for the advancement of medicines for cures of diseases.  Those medicines must be in alliance with our Catholic faith.
>
> 4.      **Right to Life**.  Defend the sanctity of life for the babies in the womb, as well as compassion and care for the mothers that are pregnant or post abortive.
>
> 5.      Serving our **community**.  Organizations or places that promote a civilization that cultivates Catholic values, promoting the family in a culture of life that is in accordance with God's place of civilization.
>
> WHEREAS, the Company, its Shareholders, and its employees all benefit from a Corporate Charitable Giving Program.
>
> BE IT THEREFORE RESOLVED that the Company may budget for and make contributions for community welfare, charitable and other corporate purposes in accordance with Ohio law (see R.C. 1701.13(D)) in the amount of ten percent (10%) of net profits to be made nine percent (9%) in cash and one percent (1%) in kind.

(Attached as Exhibit 11)   This change was six days after Joe's termination.

13

38.     This Charitable Giving Program, based upon the Biblical notion of tithing, was retroactive to January 1, 2021 and continues through today.

### PLAINTIFF'S CAUSES OF ACTION

### COUNT ONE

### (State Law Claims of Breach of Fiduciary Duty Against JTM, Tony, Jack, and Jerry)

39.     Joe realleges the allegations contained in paragraphs 1 through 38 as if fully rewritten.

40.     The law in Ohio is that the majority shareholders in a closely-held corporation have a fiduciary duty to minority shareholders. *Crosby v. Beam*, 47 Ohio St.3d 105, 108, 548 N.E.2d 217 (1989) "Courts in sister states and Ohio appellate courts have found a heighted fiduciary duty between majority and minority shareholders in a close corporation. This duty is similar to the duty that partners owe one another in a partnership because of the fundamental resemblance between the close corporation and a partnership." *Id*. citing *Donahue v. Rodd Electrotype Co. of New England, Inc.*, 367 Mass 578, 588-89, 328 N.E.2d 505 (1975). The standard is one of utmost good faith and loyalty. *Id*. Control of the stock in a closed corporation cannot be used to give the majority benefits which are not shared by the minority. *Id. at 109*. Such a breach is actionable by the minority shareholders who are individually harmed. *Id.*; *Franks v. Rankin*, Franklin Cty. No. 11Ap-962, 2012-Ohio-1920, ¶34 (10th Dist).

41.     The elements of a breach of fiduciary duty claim include (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom. *Harwood v. Pappas & Assoc., Inc.*, Cuyahoga App. No. 84561, 2005 Ohio 2442, at ¶26 (8th Dist.) citing *Strock v. Pressnell* (1988), 38 Ohio St.3d 207, 216, 527 N.E.2d 1235.

42.     By virtue of their relationship as minority shareholders, Joe, Tony, Jack, and Jerry owe a fiduciary duty to each other.

43.     As Controlling Shareholders, Tony, Jack, and Jerry breached the fiduciary duty by taking 8% of Joe's JTM net pre-tax distribution in 2015 and 2016 and tithing it to Catholic charities and organizations over Joe's objection.  These actions individually caused damages to Joe in an amount in excess of $1,000,000.00.

44.     In February of 2021, the Controlling Shareholders caused JTM to reinstitute the 10% pre-tax tithing distribution to primarily Catholic charities and organizations over Joe's objection.  These actions have and will cause Joe irreparable harm for which he has no adequate remedy at law.  Accordingly, Joe requests that the Court issue an injunction prohibiting JTM from reinstituting a corporate charitable giving program which will substantially reduce Joe's pre-tax distribution by 8% of his 25% ownership interest.

## COUNT TWO

### (State Law Claims of Breach of Fiduciary Duty for Wrongful Termination Against JTM, Tony, Jack, and Jerry)

45.     Joe realleges the allegations contained in paragraphs 1 through 44 as if fully rewritten herein.

46.     Based on Joe's minority shareholder status, he was not employed as an at-will employee for JTM.

47.     Ohio law holds that majority or controlling shareholders in a close corporation cannot terminate a minority shareholder-employee without a legitimate business purpose.  *The Estate of William A. Millhon v. Millhon Clinic, Inc.*, Franklin Cty. No. 07AP-413, 2007-Ohio-7153 (10th App.); *Thomas v. Fletcher,* Shelby App. No. 17-05-31, 2006 Ohio 6685 at ¶15 (3rd App.),

citing *Duggan v. Orthopaedic Inst. of Ohio* (N.D. Ohio 2005), 365 F.Supp.2d 853, 863 (N.D. Ohio 2004); *Gigax v. Repka* (1992), 83 Ohio App.3d 615, 623, 615 N.E.2d 644.

48.     On February 12, 2021, JTM, Tony, Jack, and Jerry terminated Joe from his employment at JTM.  Tony, Jack, and Jerry are controlling shareholders of JTM.  Tony, Jack, and Jerry were acting on behalf of JTM.

49.     Joe's wrongful termination by the Defendants constitutes a breach of fiduciary duty as there was no legitimate business purpose for his termination.

50.     As a direct and proximate cause of the Defendants' actions, Joe has been damaged in an amount of at least $6,000,000 in compensatory damages.

## COUNT THREE

### (State Law Claim for Conversion Based on Wrongful Retention of Joe's Salary, Bonuses, Benefits and Shareholder Distributions Against JTM, Tony, Jack, and Jerry)

51.     Joe realleges the allegations contained in paragraphs 1 through 50 as if fully rewritten herein.

52.     Conversion is defined as the exercise of dominion or control wrongfully exerted over the personal property of another in denial of or under a claim inconsistent with his rights. *Werthmann v. DONet, Inc.*, Montgomery Cty. Case No. 20814, 2005-Ohio-3185, ¶¶85-89 (2nd App.); *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 284-285 (2nd Dist. 2000) citing to *Bourekis v. Saidel & Assoc.*, Montgomery App. No. 14105, 1994 Ohio App. LEXIS 2783 (2nd App. 1994)

53.     The Defendants' actions in wrongfully exercising dominion or control of Joe's shareholder distributions, and withholding his salary and benefits from JTM constitutes a tort of conversion.

54.    As a direct and proximate result of Defendants' wrongful acts, Joe has been damaged in an amount not less than $3,000,000.

## COUNT FOUR

### (State Law Claim for Civil Conspiracy
### Against JTM, Tony, Jack, and Jerry)

55.    Joe realleges the allegations contained in paragraphs 1 through 54 as if fully rewritten herein.

56.    The elements of civil conspiracy require (1) a malicious combination, (2) involving two or more persons, (3) causing injury to person or property, and (4) the existence of an unlawful act independent from the conspiracy itself.  The malice portion of the tort is 'that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another.'"  *Werthmann v. DONet, Inc.*, *supra;* citing to *Gibson v. City Yellow Cab Co.* (Feb. 14, 2001), Summit Cty. Case No. 20167, 2001 Ohio App. LEXIS 518, at ¶9 (9th Dist.).

57.    The Defendants JTM, Tony, Jack, and Jerry have maliciously combined to cause injury to Joe by conspiring to breach their fiduciary duty to him as a minority shareholder.

58.    As a direct and proximate result of Defendants' actions, Joe has been damaged in an amount not less than $6,000,000.

## COUNT FIVE

### (State Law Claim for Religious Discrimination in Violation of O.R.C. §4112.02(A)
### Against JTM, Tony, Jack, and Jerry)

59.    Joe realleges the allegations contained in paragraphs 1 through 58 as if fully rewritten herein.

60.    Ohio Revised Code §4112.02(A) provides that it is an unlawful discriminatory practice for any employer, because of . . . religion. . . of any person, to discharge without just cause,

17

to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

61.     The Defendants JTM, Tony, Jack, and Jerry have violated Joe's civil rights by discriminating against him based upon religion and by imposing their religious tithing beliefs which resulted in significant involuntary charitable contributions of a portion of Joe's shareholder distributions to Catholic charities and organizations as primarily directed by Tony.

62.     The Defendants JTM, Tony, Jack, and Jerry wrongfully terminated and discriminated against Joe on or about February 12, 2021, based upon their religious convictions.

63.     As a direct and proximate result of the Defendants' unlawful conduct, Joe is entitled to damages and injunction and any other appropriate relief as provided in Ohio Revised Code §4112.99 in an amount not less than $10,000,000 dollars.

## COUNT SIX

### (State Law Claim of Retaliation Against JTM, Tony, Jack, and Jerry for Joe's Opposition to Defendants' Religious Discrimination)

64.     Plaintiff realleges the allegations contained in paragraphs 1 through 63 as if fully rewritten herein.

65.     Ohio Revised Code 4112.02(I) states that it shall be an unlawful discriminatory practice for any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revise Code.

66.     The Defendants JTM, Tony, Jack, and Jerry retaliated against Joe for opposing the Defendants' religious discrimination conduct by imposing their tithing beliefs upon Joe and

18

refusing to accommodate his belief that tithing should be done on an individual basis and not corporately at his expense in violation of Ohio Revised Code §4112.02(I).

67.    As a direct and proximate result of their unlawful conduct, Joe is entitled to damages and injunction and any other appropriate relief as provided under Ohio Revised Code §4112.99 in an amount not less than $10,000,000 dollars.

## COUNT SEVEN

### (State Law Claim of Retaliation Against JTM, Tony, Jack, and Jerry for Joe's Opposition to the Defendants' Gender Discrimination)

68.    Joe realleges the allegations contained in paragraphs 1 through 67 as if fully rewritten herein.

69.    Ohio Revised Code §4112.02(A) provides that it is an unlawful discriminatory practice for any employer, because of . . . sex. . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

70.    Ohio Revised Code 4112.02(I) states that it shall be an unlawful discriminatory practice for any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revise Code.

71.    Throughout Joe's employment, he complained about Tony's gender animas against females.  Most recently, in October of 2020, Joe opposed the discriminatory conduct of Tony by urging JTM to cease Tony's trips to Arizona to participate in Reds Fest on the basis that no females were invited to participate in this company benefit and Tony's actions were illegal.

72.     As a direct and proximate result of Joe's oppositional conduct, the Defendants retaliated against him by terminating him on February 12, 2021.

73.     Joe is entitled to all damages and an injunction as provided under Ohio Revised Code §4112.99 for the Defendants' violation of Ohio Revised Code §4112.02(A) and §4112.02(I).

**COUNT EIGHT**

**(State Law Claim for Aiding and Abetting Against JTM, Tony, Jack, and Jerry for their Conspiratorial Actions in Violation of Chapter 4112 of the Ohio Revised Code)**

74.     Joe realleges the allegations contained in paragraphs 1 through 73 as if fully rewritten herein.

75.     Ohio Revised Code 4112.02(J) states it shall be an unlawful discriminatory practice for any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under Sections 4112.01 to 4112.07 of the Revised Code.

76.     The Defendants JTM, Tony, Jack, and Jerry have aided and abetted each other in violating the provisions of Chapter 4112 of the Ohio Revised Code as set forth herein.

77.     The wrongful actions of the Defendants identified in paragraph 76 of this complaint were willful and in wanton disregard of Joe's legal and employment rights therefore entitling him to damages jointly and severally against the Defendants in the amount of no less than $10,000,000 dollars.

**COUNT NINE**

**(State Law Claim for Wrongful Discharge in Violation of Ohio Public Policy Against All Defendants)**

20

78.     Joe realleges the allegations contained in paragraphs 1 through 77 as if fully rewritten herein.

79.     Pursuant to Federal Rule of Civil Procedure 8(d)(2), Joe asserts this claim alternatively based upon Defendants' anticipated response that Joe was not a minority shareholder, but instead an at-will employee.  If Joe was employed at JTM as an at-will employee, he then has a claim for wrongful discharge in violation of Ohio Public Policy.

80.     There exists a clear public policy in the State of Ohio which protects employees from termination when they consult with an attorney regarding matters that would affect their employment and their employer's business.  That policy is set forth in the cases of *Chapman v. Adia Servs Inc.*, 116 Ohio App.3d 534, 542-43, 688 N.E.2d 604, 609 (1st Dist. 1997); *Hollingsworth v. Time Warner Cable*, 157 Ohio App.3d 530 (1st Dist. 2004); *Simonelli v. Anderson Concrete Co.*, 99 Ohio App.3d 254, 259, 650 N.E.2d 488 (10th Dist. 1994); *Daniels v. Fraternal Order of Eagle of Tecumseh No. 979*, 162 Ohio App.3d 446, 2005-Ohio-3657, 833 N.E.2d 1253 (2nd Dist. 2005);  *Newcomb v. Hostetler Catering, Inc.*, Richland Cty. No. 2006 CA 0040, 2007-Ohio-361 at ¶31 (5th Dist.); *Jacobs v. Highland County Bd.*, Highland Cty. No. 13 CA 20, 2014-Ohio-4194 at ¶22, 20 N.E.2d 300 (4th Dist. 2014); and *Terrill v. Uniscribe Prof'l Servs.* 348 F.Supp.2d 890, fn 6 (N.D. Ohio, 2004).

81.     The actions of the Defendants in terminating Joe on February 12, 2021 places in jeopardy the public policy that exists in Ohio.

82.     On February 11, 2021, Joe sought advice of counsel relating to a Separation Agreement and Release that had been provided by the Defendants for Joe to review and their demand that he resign from JTM.  (See Exhibit 8).

83.     As indicated, after the meeting, Joe's counsel sent an email to JTM informing it and the Defendants of legal counsel's representation of Joe.

84.     Within 24 hours after Joe seeking advice of counsel and notification of that legal representation to the Defendants, Joe was terminated on February 12, 2021.

85.     That termination was in retaliation for his consultation with counsel on February 11, 2021 regarding Joe's employment and JTM's business matters.

86.     JTM and the Defendants lacked any overriding, legitimate justification for Joe's termination as am employee.

87.     As a direct and proximate cause of JTM and Defendants' retaliatory actions, Joe has been wrongfully discharged in violation of public policy and is entitled to damages.

88.     The actions of JTM and the Maas Brothers were in wanton and willful disregard of Joe's legal and employment rights which entitles him to punitive damages against each Defendant individually in the amount of $1,000,000, and compensatory damages in the amount of no less than $10,000,000 dollars.

## COUNT TEN

### (A Claim Under Title VII for Religious Discrimination and Retaliation Against JTM)

89.     Joe realleges the allegations contained in paragraphs 1 through 88 as if fully rewritten herein.

90.     On or about November 23, 2021, Joe timely filed a Charge of Discrimination with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC").  A copy of the Charge is attached as Exhibit 12.  The charge is assigned Case No. DAY(29985)11232021 by the OCRC and 473-2022-00319 by the EEOC.

22

91. After conducting an investigation, the OCRC issued a Right to Sue on or about October 20, 2022. A copy of that document is attached as Exhibit 13. On July 13, 2022, Joe, through counsel, wrote to the EEOC requesting a Right to Sue letter for his federal claims. A copy of that letter is attached as Exhibit 14. By December 29, 2022, neither Joe nor his counsel had received a Right to Sue letter that had been previously requested on July 13, 2022. Consequently, Joe, through counsel, sent a second letter to the EEOC seeking a Right to Sue letter.

92. On the morning of January 4, 2023, Joe's counsel was informed by a representative of the EEOC that a Right to Sue letter had been issued in July, but had not been sent to Joe or his counsel. Later that day, the EEOC supervisor identified as Ramiro Gutierrez confirmed that the EEOC had not mailed to Joe or Joe's counsel the Right to Sue letter that had been issued by the EEOC in July. Subsequently, a Right to Sue letter was issued to Joe and his counsel on January 5, 2023 which was received by Joe and his counsel on or about January 7, 2023. A copy of the Right to Sue is attached as Exhibit 15. This was the first Right to Sue letter and notice that Joe and his counsel received from the EEOC regarding Charge 473-2022-00319. Joe has satisfied the administrative prerequisites in order to bring a claim against the Defendant JTM under federal law by filing this lawsuit within 90 days of his or his counsel's receipt of the Notice of Right to Sue.

93. As previously disclosed, Joe was terminated from his employment on February 12, 2021.

94. During the approximately 45 years of time in which Joe was employed with JTM, her performed his job duties in a competent and capable manner.

95. JTM's actions against Joe, by and through its officers including Tony, Jack, and Jerry, were because of Joe's opposition to the religious tithing imposed upon him including his

refusal to execute the Charitable Charter, refuse to agree to the tithing requirement, and the failure of JTM to accommodate his opposition to those tithing practices.

96.    JTM has violated 42 U.S.C. §2000e-2(a)(1).  Joe is entitled to all relief as set forth in Title VII and 42 U.S.C. §1981(a) including, but not limited to, reinstatement, reasonable attorney's fees, compensatory and punitive damages, along with a front and back pay award.

97.    JTM has also violated 42 U.S.C. §2000e-3(a) by retaliating against Joe for his religious opposition to his brothers' and JTM's religious convictions and failing to accommodate Joe regarding his opposition to tithing.

98.    Joe further states that in the event the Court or jury finds that religion was a motivating factor in his termination, but that JTM would have terminated Joe notwithstanding its unlawful motivation, Joe requests the Court issue a declaratory judgment, injunctive relief, and the payment of his reasonable attorney's fees pursuant to 42 U.S.C. §2000e-2(m) and 42 U.S.C. §2000e-5(g)(2)(B)(i).

## COUNT ELEVEN

### (A Claim Under Title VII for Retaliation due to Joe's Opposition to JTM's Discriminatory Conduct Actions Against Females)

99.    Joe realleges the allegations contained in paragraphs 1 through 98 as if fully rewritten herein.

100.    Throughout Joe's employment, he opposed Tony's unlawful conduct in favoring male employees over female employees in terms of compensation and job benefits.

101.    In October of 2020, Joe voiced his opposition that Tony was favoring males over females with regard to company sponsored trips and that such conduct was discriminatory and unlawful.

102.     As a direct and proximate result of Joe's opposition to JTM's unlawful employment practices relating to gender discrimination, he was terminated from his employment in violation of 42 U.S.C. §2000e-3(a).

103.     JTM has also violated 42 U.S.C. §2000e-3(a) by retaliating against Joe for his religious opposition to his brothers' and JTM's religious convictions. Joe is entitled to all relief set forth in Title VII and 42 U.S.C. §1981(a) including, but not limited to, reinstatement, reasonable attorney's fees, compensatory and punitive damages, along with a front and back pay award.

104.     Joe further states that in the event the Court or jury finds that religion was a motivating factor, but that JTM would have terminated Joe notwithstanding its unlawful motivation, Joe requests the Court issue a declaratory judgment, injunctive relief, and the payment of his reasonable attorney's fees pursuant to 42 U.S.C. §2000e-2(m) and 42 U.S.C. §2000e-5(g)(2)(B)(i).

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in an amount to be determined at trial. Plaintiff requests he be awarded compensatory and punitive damages, prejudgment interest, reasonable attorney fees, injunctive relief, declaratory relief, and any other additional relief to which he may be entitled including reinstatement to his position.

Respectfully submitted,

/s/   Mark J. Byrne
**MARK J. BYRNE (0029243)**
**KATHLEEN R. BYRNE (0099931)**
Jacobs, Kleinman, Seibel & McNally, LPA
30 Garfield Place, Suite 905
Cincinnati, Ohio  45202
Phone:  (513) 381-6600
Fax:     (513) 381-4150
E-mail:  mbyrne@jksmlaw.com
*Attorneys for Plaintiff*

## **TRIAL BY JURY**

Plaintiff requests a trial by jury on all issues so triable.

/s/   Mark J. Byrne
Mark J. Byrne (0029243)