**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| JOSEPH MAAS, *et al.*, | : |
| *Plaintiffs*, | : Case No. 1:23-cv-00076-JPH |
| v. | : Judge Jeffery P. Hopkins |
| JTM PROVISIONS COMPANY, INC., *et al.*, | : |
| *Defendants*. | : |

---

## OPINION AND ORDER

---

"All happy families are alike; each unhappy family is unhappy in its own way." LEO TOLSTOY, ANNA KARENINA 1 (1877). Here, Plaintiff Joseph R. Maas ("Joe" or "Plaintiff") has haled his brothers, Anthony A. Maas ("Tony"), John T. Maas, Jr. ("Jack"), Jerome T. Maas ("Jerry") (the "Maas Defendants") and the family company, JTM Provisions Company, Inc. ("JTM") (collectively, "Defendants"), back into court for the *third* time since November 2017. Doc. 31, PageID 976. The lawsuits between the family members have been as drawn-out and contentious as the recriminations therein have been bitter and acrimonious. Joe has been stubbornly persistent in refashioning many of the same claims for relief already disposed of in the previous state court actions. Tony, Jack, and Jerry have been just as defiant in asserting that Joe has not suffered any harm. These are the circumstances that render the Maas family "unhappy in its own way." But between these two extremes, this Court will seek to chart a middle path, acknowledging the pain that both parties have felt, yet also hoping to guide the Maas family members to the proverbial promised land of a mutual détente.

As such, comes now this matter before the Court on Defendants' Partial Motions to Dismiss Counts One, Two, Four, Five, Six, Eight, Nine, and Ten (Docs. 31, 32) of the First Amended Complaint ("Amended Complaint").[1] Doc. 29. For the reasons set forth below, Defendants' Motions to Dismiss are **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

### A.    Factual Background

Incorporated in 1974, JTM is a closely held, family-owned, food-processing business based in Harrison, Ohio. Doc. 29, ¶ 5. JTM is equally owned and controlled by Tony, Jack, Jerry, and Joe, who each hold 25% of JTM's outstanding shares of common stock, and who, as this Court understands, all sit on JTM's Board of Directors (the "Board"). *Id*. at ¶¶ 10–12. Tony Maas is the President and Chief Executive Officer of JTM. *Id*. at ¶ 6. Jack Maas is the Chairman of the Board and was previously involved with JTM's sales and marketing efforts. *Id*. at ¶ 7. Jerry Maas serves as the Vice President of JTM. *Id*. at ¶ 8. Joe Maas is a minority shareholder and former employee of JTM. *Id*. at ¶¶ 3, 60. Before being reassigned to Vice President of Industry and Government Relations, Joe previously served as a Vice President of Engineering at JTM for nearly forty years. Doc. 29-24, PageID 754. LCNB National Bank ("LCNB") is the duly appointed successor trustee of the irrevocable trusts of Joe Mas and Robin P. Maas (collectively, "the Trusts") and is a party in interest for the claims asserted by The Trusts against the Defendants. Doc. 29, ¶ 4.

Many Maas family members are devout Catholics, and the faith of the majority of the

---

[1] In what appears to be oversight, Defendants include only Counts One, Two, Four, Five, Six, Eight, and Ten in the heading of their Motions to Dismiss. *See* Doc. 31, PageID 970; Doc. 32, PageID 1049. But Defendant JTM also disputes Count Nine. *Id*. at PageID 1051. The Court does not consider this small omission to be a waiver of Defendant JTM's arguments and will proceed to address the parties' contentions as to Count Nine.

Maas brothers has made its way into the finances and business operations of the family business. Throughout its years, JTM has maintained a tithe—a charitable giving program whereby 10% of its yearly pre-tax net profits have been donated to predominantly Catholic charitable organizations. *Id.* at ¶ 14. Since at least November 2016, the tithe became a chronic point of contention between Joe and the other brothers, the Maas Defendants. *Id.* at ¶¶ 17–19. On February 9, 2017, after numerous objections from Joe and complaints from other independent Board members, the Board passed a corporate resolution limiting JTM's annual tithing contributions to a maximum of 2% of its pre-tax net income ("2017 Corporate Resolution"). *Id.* at ¶¶ 32, 33. The Maas Defendants continued to make additional charitable contributions on a personal basis. *Id.* at ¶ 35.

But despite the Board reaching this compromise, the relationship between Joe and Tony, Jack, and Jerry only further deteriorated. Between June and October 2017, Joe wrote to numerous JTM officers and Board Members expressing his concern at Tony's practice of "openly condemn[ing] homosexuality, engag[ing] in sexual harassment by giving certain benefits to males only, and embrac[ing] religious harassment by openly stating that Catholicism is the only true religion." *Id.* at ¶¶ 40–43. Joe alleges that, almost immediately after his complaints about religious discrimination, sex discrimination, and sexual harassment, Defendants retaliated against him by removing his engineering duties and assigning him the title of VP of Industry and Government Relations. *Id.* at ¶ 43.

## B. Procedural History

On November 17, 2017, Joe filed a derivative shareholder suit in the Hamilton County Court of Common Pleas on behalf of JTM against the JTM Board and Tony for claims related to self-dealing, the Board's breach of fiduciary duties, and other illegal activities. *Id.* at ¶ 44.

3

The trial court granted summary judgment for Defendants on all counts.[2] *Maas v. Maas*, Hamilton C.P. No. A1705836, 7 (Aug. 28, 2019). Joe appealed the trial court's decision, but it was affirmed by the Ohio First District Court of Appeals on November 4, 2020. *Maas v. Maas*, 2020-Ohio-5160 (1st Dist.). Following the appeals court decision, the Board passed a resolution on February 18, 2021 ("2021 Corporate Resolution"), reinstating the pre-tax 10% charitable giving level at JTM. Doc. 29, ¶ 94.

On February 12, 2021, after weeks of correspondence and tense meetings regarding the future of his employment status at JTM, Joe alleges that he was terminated without cause at the insistence of Tony, Jack, and Jerry. *Id*. at ¶ 3. On March 16, 2021, Joe again filed suit under Case No. A-2100951 in the Court of Common Pleas of Hamilton County. *Id*. at ¶ 96. That second lawsuit claimed in part that Joe's termination occurred because of religious discrimination and his opposition to Tony's religious preferences. *Id*. After nearly two years of litigation, Joe voluntarily dismissed that action without prejudice pursuant to Ohio Civ. R. 41(A). Doc. 31, PageID 979.

Joe filed the instant action in this Court on February 10, 2023. *Id*. Adding LCNB as a plaintiff (collectively, the "Plaintiffs") and successor-trustee for the irrevocable trusts that hold his non-voting shares of JTM, Joe asserts largely the same claims against Defendants that he previously brought but subsequently voluntarily dismissed in the second state court suit. *Id*. The Amended Complaint alleges numerous causes of action against Defendants arising under Title VII for religious discrimination and retaliation and gender and sexual orientation

---

[2] The complaint in the state court action contained four counts. Count One was an individual claim for breach of fiduciary duties owed to Plaintiff by JTM's officers and directors. Doc. 36, PageID 1061. This claim was dismissed by the trial court on a motion to dismiss. *Id*. Counts Two, Three, and Four, which were disposed of during summary judgment, asserted derivative shareholder claims under Ohio law against the JTM officers and directors for breach of fiduciary duty. *Id*.

4

discrimination; E.R.I.S.A. for breaches of fiduciary duty and Section 510; and various other state law claims.[3] Doc. 29, PageID 615–30.

## II.    STANDARD OF REVIEW

Defendants moved to dismiss Counts One, Two, Four, Five, Six, Eight, Nine, and Ten of the Amended Complaint under Rule 12(b)(6). Docs. 31, 32. A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, a complaint must include "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This, however, requires "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable interference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Indeed, under the plausibility standard set forth in *Twombly* and *Iqbal,* courts play an important gatekeeper role, ensuring that claims meet a

---

[3] Under the Amended Complaint, Joe makes multiple claims against Defendants: a claim under Title VII against JTM for religious discrimination and retaliation (Count I); a claim under Title VII against JTM for retaliation due to Joe's opposition to JTM's discriminatory conduct actions against females (Count II); a federal claim against JTM and the Maas Defendants for violations of E.R.I.S.A. (Count III); a state law claim against JTM and the Maas Defendants for religious discrimination in violation of O.R.C. §4112.02(A) (Count IV); a state law claim against JTM and Maas Defendants for retaliation of Joe's opposition to Defendants' religious discrimination (Count V); a state law claim of retaliation against JTM and Maas Defendants for Joe's opposition to Defendants' gender discrimination (Count VI); a state law claim against JTM and Maas Defendants for aiding and abetting conspiratorial actions in violation of O.R.C. §4112.02 (Count VII); state law claims against JTM and Maas Defendants for breach of fiduciary duty (Count VIII); state law claims against JTM and Maas Defendants for breach of fiduciary duty for wrongful termination (Count IX); a state law claim against JTM and Maas Defendants for conversion based on wrongful retention of Joe's salary, bonuses, benefits, and shareholder distributions (Count X); a state law claim against JTM and Maas Defendants for civil conspiracy (Count XI); a state law claim against JTM and Maas Defendants for wrongful discharge in violation of Ohio public policy (Count XII); declaratory judgment against JTM and Maas Defendants as to Joe's rights as an owner of Maas Enterprises, LLC (Count XIII). Doc. 29, PageID 614–30.

plausibility threshold before defendants are subjected to the potential rigors (and costs) of the discovery process. "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims." *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

In deciding a motion to dismiss, the district court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007). In doing so, the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir. 2000). On a Rule 12(b)(6) motion, a district court "may consider exhibits attached to the complaint, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 681 (6th Cir. 2011) (cleaned up).

## III. LAW AND ANALYSIS

### A. Religious Discrimination and Retaliation Under Title VII Against JTM

Joe alleges in Count One of the Amended Complaint that JTM and its agents "systematically removed [his] job duties, responsibilities, titles, and ultimately terminated [him] from his employment in violation of 42 U.S.C. §2000e-2(a)(1)." Doc. 29, ¶ 105. Joe asserts that JTM's retaliatory actions against him "were because of [his] opposition to the religious tithing imposed upon him including his refusal to execute the Charitable Charter, refusal to agree to the JTM tithing requirement, and the failure of JTM to accommodate his opposition to those tithing practices." *Id*. at ¶ 104.

JTM moves to dismiss the claim, incorporating by reference the Maas Defendants' arguments to Counts Four, Five, and Six. Doc. 32, PageID 1050. Thus, JTM asserts that this claim is "barred on the basis of res judicata and collateral estoppel under Ohio Law," is insufficiently pled because Joe "does not allege that [he] engaged in protected activity" to render him within the ambit of Title VII, and "fails as a matter of law" for want of a causal connection between Joe's opposition to religious discrimination and the alleged retaliation against him. Doc. 31, PageID 982, 994, 998.

Joe responds that res judicata and collateral estoppel do not bar his claim. Doc. 37, PageID 1083. Joe points to the fact that his termination on February 12, 2021 "did not arise until after the completion of the state court lawsuits." *Id*. He maintains that this claim survives the motion to dismiss because, in part, it "could not have been raised in [the prior state court lawsuit] because [it] did not exist at the time." Doc. 36, PageID 1069 n.3. Furthermore, Joe contends that he has identified an adverse employment action—and therefore plausibly set forth a Title VII claim—by alleging that Defendants "terminated [him] because of his non-conforming religious views." Doc. 47, PageID 1182.

Before assessing whether res judicata and collateral estoppel apply, the Court begins its analysis by first determining whether Joe has stated a cognizable claim upon which relief may be granted. Title VII "preclude[s] employers from discriminating against an employee because . . . the employee fails to comply with the employer's religion." *Pedreira v. Kentucky Baptist Homes for Child., Inc.*, 579 F.3d 722, 727 (6th Cir. 2009). To state a claim for religious nonconformity under Title VII, a plaintiff must allege that "an employee's 'lack of adherence to the religious beliefs promoted by the [employer] was the genesis of the discrimination.'" *Amos v. Lampo Grp., LLC*, No. 24-5011, 2024 WL 3675601, at *2 (6th Cir. Aug. 6, 2024)

(quoting *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007)). The plaintiff must assert that an adverse employment action was "'taken because of a discriminatory motive based upon the employee's failure to hold or follow her employer's religious beliefs.'" *Id.* (quoting *Owens v. City of New York Dep't of Educ.*, No. 21-2875, 2022 WL 17844279, at *2 (2d Cir. Dec. 22, 2022)). "If a reasonable court can draw the necessary inference [of discrimination] from the factual material stated in the complaint, the plausibility standard has been satisfied." *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012)).

This Court holds that Joe has plausibly alleged that JTM discriminated against him on account of his nonconformity with Defendants' religious convictions. In a December 21, 2019 email, Tony remarked that "it is not possible to co exist [*sic*] [with Joe] when there is no agreement on mission and vision," and that for Joe to be welcomed back "into the partnership," it would need to be "in a unified way that is in line with our catholic [*sic*] belief . . . ." Doc. 29, ¶ 68. In their previous state court depositions, Jack and Jerry agreed that "one of the reasons for Joe's termination [was] that [Joe] didn't accept the JTM mission which is religious tithing." *Id.* at ¶ 96. While this assertion implies that there may have been other viable reasons for Joe's termination, coupled with Tony's statement that "Joe violated the most sacred of all our commitment to tithing [*sic*]," a reasonable inference can be drawn that Joe's noncompliance with JTM's religious practices brought about the unlawful, retaliatory termination for which he now seeks relief. *Id.* Construing the Amended Complaint in the light most favorable to Joe and accepting the underlying allegations as true, these candid admissions alone are reason enough to plausibly claim that Defendants, by terminating Joe

from his employment with JTM, retaliated against Joe on account of his nonconformity with Defendants' religious practices in violation of 42 U.S.C. §2000e-2(a)(1).[4]

But the analysis of this claim does not end here. Notably, Joe's claim rests in part on Defendants' alleged "systematic[] remov[al]" of his "job duties, responsibilities, [and] titles," much of which occurred before and during the state court proceedings between 2016 and 2019. Doc. 29, ¶ 105. As Defendants argue, to the extent that Joe's claim in federal court is based on those occurrences which arose throughout the initial state court proceeding, it would be barred by res judicata because such a claim "could have been litigated in the previous action" and "arise[s] out of the same transaction or occurrence." Doc. 31, PageID 984. The Court now turns to whether Joe's claim is precluded, either entirely or in part.

"Under Ohio law, the doctrine of res judicata consists of 'the two related concepts of claim preclusion, also known as res judicata or estoppel by judgment, and issue preclusion, also known as collateral estoppel.'" *Doe ex rel. Doe v. Jackson Local Schs. Sch. Dist.*, 422 Fed. Appx. 497, 500 (6th Cir. May 11, 2011) (quoting *O'Nesti v. DeBartolo Realty Corp.*, 2007-Ohio-1102, ¶ 6). "Claim preclusion prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject of a previous action." *Id.* The doctrine bars subsequent actions for claims that "could have been litigated in the previous suit." *Id.* By contrast, issue preclusion prevents the "relitigation of any fact or point

---

[4] The statute reads, in part:

It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or **to discharge any individual**, or otherwise to **discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of** such individual's race, color, **religion**, sex, or national origin…

42 U.S.C. §2000e-2(a)(1) (emphasis added).

that was determined by a court of competent jurisdiction in a previous action between the same parties or their privies[,]" even if the causes of action differ. *Id.* at ¶ 7.

> Under Ohio law, claim preclusion has four elements:
>
> (1) a prior final, valid decision on the merits by a court of competent jurisdiction; (2) a second action involving the same parties, or their privies, as the first; (3) a second action raising claims that were or could have been litigated in the first action; and (4) a second action arising out of the transaction or occurrence that was the subject matter of the previous action."

*Hapgood v. City of Warren*, 127 F.3d 490, 493 (6th Cir. 1997) (applying Ohio res judicata law to determine whether an Ohio court's prior judgment precluded a federal action). "An issue is actually litigated when it 'is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined.'" *In re Leonard*, 644 F. App'x 612, 616 (6th Cir. 2016) (quoting Restatement (Second) of Judgments § 27 cmt. d (Am. L. Inst. 1982)). Importantly, the party asserting this defense bears the burden of proof. *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 572 (6th Cir. 2008).

> Similarly, for issue preclusion to apply under Ohio law, four elements must be established:
>
> (1) A final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue; (2) The issue must have been actually and directly litigated in the prior suit and must have been necessary in the final judgment; (3) The issue in the present suit must have been identical to the issue in the prior suit; [and] (4) The party against whom estoppel is sought was a party or in privity with the party to the prior action.

*Smith v. Lerner, Sampson, & Rothfuss, L.P.A.*, 658 Fed. Appx. 268, 278-279 (6th Cir. 2016).

Turning to this case before us, this present federal action "involve[es] the same parties" and "aris[es] out of the transaction or occurrence that was the subject matter of the previous [state court] action." *Hapgood*, 127 F.3d at 493. Joe previously asserted that Defendants "unfairly deprive[d] [him] of corporate opportunities" and "retaliated against him by

10

orchestrating his removal as Vice President of Engineering in August, 2017." Doc. 31-1, PageID 1028. Thus, Joe's claim regarding his opposition to, and Defendants' retaliation for his opposition to, JTM's "charitable giving" practices "could have been litigated" in the prior state court proceedings, which provided a final, valid decision on the propriety of JTM's "charitable giving" program. *Hapgood*, 127 F.3d at 493; *see also Maas v. Maas*, Hamilton C.P. No. A1705836, 4 (Aug. 28, 2019); *Maas v. Maas*, 2020-Ohio-5160 (1st Dist.).

Nonetheless, Joe's claim survives. Joe alleges a new adverse employment action—the February 2021 termination—that was not nor "could have been litigated in the first [state court] action." *Hapgood*, 127 F.3d at 493. Neither was the February 2021 termination "actually and directly litigated in the prior suit." *Smith*, 658 Fed. Appx. at 278. Therefore, this claim under Title VII shall be limited to Defendants' post-2019 alleged religious discrimination against Joe, including their failure to accommodate Joe's opposition to the tithing practices, and to Defendants' post-2019 alleged retaliations against Joe, culminating in his termination from JTM in February 2021. This claim does *not* encompass the pre-2019 removal of Joe's employment responsibilities with JTM due to his refusal to consent to the tithing requirement because such claims are precluded from being brought in this federal action. Neither is this claim to be based solely on the allegation that JTM's tithing requirement is religious discrimination *per se*.

### B. Retaliation for Opposition to Sexual Discrimination under Title VII Against JTM

In Count Two of the Amended Complaint, Joe alleges that he was terminated from JTM because of his "opposition to JTM's unlawful employment practices relating to gender discrimination." Doc. 29, ¶ 111. Specifically, Joe asserts that JTM retaliated against him were because he "opposed JTM's unlawful conduct of sexual harassment by Tony, and JTM's

gender discrimination by favoring male employees over female employees in terms of compensation and job benefits, and discrimination against homosexuals." *Id*. at ¶ 110.

JTM moves to dismiss this claim, again incorporating by reference the Maas Defendants' arguments to Counts Four (religious discrimination), Five (retaliation for opposition to religious discrimination), and Six (retaliation for opposition to gender discrimination). Doc. 32, PageID 1050. Thus, JTM asserts that this claim is "barred on the basis of res judicata and collateral estoppel under Ohio Law," is insufficiently pled because Joe "does not allege that [he] engaged in protected activity" to render him within the ambit of Title VII, and "fails as a matter of law" for want of a causal connection between Joe's opposition to sexual discrimination and the alleged retaliation against him. Doc. 31, PageID 982, 994, 998.

To withstand a motion to dismiss a claim of retaliation under Title VII, a plaintiff must establish that:

> (1) [he] engaged in a protected activity; (2) [his] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (internal quotation marks and citations omitted). "[T]he final element requires proof of so-called 'but-for' causation," *i.e.*, proof that the unlawful retaliation would not have occurred *but for* the employee's protected conduct. *Mys v. Michigan Dep't of State Police*, 886 F.3d 591, 600 (6th Cir. 2018). "To show causation, 'a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken' in the absence of the protected conduct." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). "The burden of proof at the prima facie

stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

"'Although no one factor is dispositive in establishing a causal connection, evidence that . . . the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.'" *Henry v. Abbott Laboratories*, 651 F. App'x 494, 505 (6th Cir. 2016) (quoting *Nguyen*, 229 F.3d 559). Courts analyze this period between the exercise of rights and the consequent retaliation under the "temporal proximity" method of proving causation. *See e.g.*, *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 664 (6th Cir. 2020) (finding that an inference of causation may sometimes arise "solely from the closeness in time between the point at which an employer learns of an employee's protected activity and the point at which it takes an adverse action against that employee") (citing *Nguyen*, 229 F.3d at 563); *see also Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 306 (6th Cir. 2012) (holding that a lapse of two months was sufficient to show a causal connection based on temporal proximity); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (holding that a lapse of three months was sufficient); *but see Hall v. Banc One Mgt. Corp.*, 2006-Ohio-913, ¶ 47 (10th Dist.) (finding that an interval of two months between complaint and adverse action "so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [a plaintiff's] favor on the matter of causal link") (citation omitted), *rev'd on other grounds by* 2007-Ohio-4640; *Ningard v. Shin Etsu Silicones*, 2009-Ohio-3171, ¶ 17 (9th Dist.) (holding that mere temporal proximity does not suffice, "especially where the events are separated by more than a few days or weeks").

13

Because JTM simply incorporates by reference the Maas Defendants' arguments in Counts Four, Five, and Six regarding the Ohio Revised Code to JTM's argument in Count Two concerning Title VII, the Court will need to separately ascertain what element of Count Two is in dispute. Advocating for members of a protected class is a protected activity for purposes of Title VII retaliation claims. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th Cir. 2009). It is reasonable to infer that Joe's statements on August 28, 2020 that "offering an entertainment perk only available to male[] [employees] is dangerous and downright illegal" and that "[s]everal female employees have remarked that they feel slighted because Tony only makes extravagant team building perks available to males" qualify as advocacy for members of a protected class, namely females. Doc. 29, ¶ 77. It is also reasonable to infer that Defendants were made aware of Joe's advocacy because the email containing such statements was sent to, among others, Tony, Jerry, and Jack as agents of JTM. Doc. 29-40, PageID 858. And it suffices to say that Joe's termination from JTM was an action taken by Defendants that was "materially adverse" to Joe. The Court now turns to the last remaining element of causation.

And it is on this pillar that Joe's claim fails. Joe alleged that his "most recent[]" opposition to the alleged gender discrimination was his August 28, 2020 email complaint regarding the use of JTM funds to take employees to Reds Dream Week with Tony, a "perk only available to male[] [employees]." Doc. 29, ¶ 78; Doc. 29-40, PageID 858. Because Joe was not terminated until February 12, 2021, Defendants argue that this "six-month temporal lag" renders Joe's "retaliation claim [a failure] as a matter of law." Doc. 31, PageID 998. But Sixth Circuit "precedent expressly rejects the . . . position that a span of more than six months between protected activity and adverse action categorically precludes finding causation."

14

*Sharp v. Aker Plant Servs. Grp., Inc.*, 600 F. App'x 337, 341 (6th Cir. 2015); *see also Harrison v. Metro. Gov't of Nashville & Davidson Cnty.*, 80 F.3d 1107, 1118–19 (6th Cir. 1996) (holding that the evidence supported a prima facie case of causation where the alleged retaliation occurred one year and three months after the protected activity), *overruled on other grounds by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 n.6 (6th Cir. 1999).

The admittedly lengthy six-month temporal period between Joe's opposition to the alleged gender discrimination and the adverse employment action of his February 2021 termination from JTM does not resolve the question of causation. For "temporal proximity alone does not support an inference of retaliatory discrimination in the absence of other evidence." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000). There are nevertheless two situations in which even a long lapse of time is not fatal to a plaintiff's causation showing.

*First*, a court may still infer causation "where the defendant took advantage of its first meaningful opportunity to retaliate against the plaintiff, even if that opportunity did not arise until several months after the plaintiff's protected conduct." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 664 (6th Cir. 2020). Here, Joe does not allege, nor would the Court agree, that the February 2021 termination was Defendants' "first meaningful opportunity to retaliate" against him. *Id.* Therefore, Joe's causation showing fails under this path.

*Second*, "even if enough time passes between the protected activity and the adverse action so as to preclude a finding of causation based on the close timing alone, an employee can still prevail if [he] 'couple[s] temporal proximity with other evidence of retaliatory conduct to establish causality.'" *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir.

2020) (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Joe's causation showing fails under this path as well.

As mentioned previously, a causal connection may be inferred if there is proof of temporal proximity between the protected activity and the adverse employment action "coupled with other indicia of retaliatory conduct." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006). Joe does not identify any *specific* retaliatory conduct for his opposition to the alleged gender discrimination, other than his February 2021 termination from JTM.[5] Joe points to two cases with similar time periods between a plaintiff's opposition to the alleged discrimination and the consequent retaliation in an attempt to demonstrate that the six-month time period is sufficiently proximate. Doc. 36, PageID 1078. But both of those cases are inapposite for the same reason: in both of those cases, there were other indicia of retaliatory conduct. That is notably absent here.

In *O'Neill v. Scripps Media Inc*, the court held that a plaintiff, who had been terminated from her position as a news anchor, adequately pled a Title VII retaliation claim even where "approximately seven months elapsed between the alleged protected activity and [the] adverse

---

[5] Count Two of the Amended Complaint identifies only one (1) concrete instance of Joe voicing his opposition to alleged sexual discrimination—Joe's August 2020 objection to the Reds Dream Week event—and only one (1) specific adverse action—Joe's termination from JTM in February 2021. Doc. 29, ¶¶ 109–10. Thus, the Court's analysis is confined to these allegations. It is not lost on the Court that, throughout the Amended Complaint, Joe alleges that he lodged general objections to Tony's alleged sexual discrimination and sexual harassment. *See id.* at ¶¶ 52, 60, 92. But Joe only identifies a few specific instances of tangible opposition to Tony's alleged sexual discrimination, all of which occurred between September and October 2017, and one regarding pay discrimination that "was immediately corrected when identified." Doc. 29-19, PageID 704. Joe generally pleads that Defendants took several other actions between 2017 and 2018 that were "in further retaliation for Joe's opposition to . . . Tony's gender discrimination and sexual harassment." Doc. 29, ¶ 52. However, these allegations may be barred by the statute of limitations and by claim and issue preclusion. Simply put, Defendants' pre-February 2021 alleged retaliations are too far removed from Joe's pre-August 2020 alleged oppositions, which are themselves too abstractly pled, to satisfy the causation requirement and to constitute a cognizable claim.

16

employment action." No. 1:23-cv-410, 2024 WL 836955, at *11 (S.D. Ohio Feb. 28, 2024), *report and recommendation adopted*, No. 1:23-cv-410, 2024 WL 1771905 (S.D. Ohio Apr. 24, 2024). There, the court found that the plaintiff plausibly alleged the requisite causation because she provided "additional context" for her claim. *Id*. at *2, *11. The court noted that, shortly after stating she was discriminated against "because of her age, gender, or color," plaintiff was "confronted" by the director of the media company, taking issue with plaintiff "voicing her complaint to her coworkers." *Id*. at *9. The court further considered that, "only several weeks after [the plaintiff's] protected activity, at [plaintiff's] regularly scheduled quarterly personnel evaluation," "supervisors raised criticisms never before raised in [plaintiff's] 27-[year] career with [the company]." *Id*. at *11. These pedantic criticisms included "laughing too much on the air" and "awkward tosses." *Id*. at *2. And the plaintiff also alleged that she had an additional HR meeting focusing on "minor criticisms," which was similarly "unprecedented." *Id*. These were the other, *specific* indicia of retaliatory conduct that informed the court's determination that the plaintiff there had plausibly stated a Title VII retaliation claim.

Similarly, in *Zarza v. Bd. of Regents of the Univ. of Michigan*, the court found that the plaintiff, a former custodial manager who had been fired from the university, established causation by "bolster[ing]" the four-to-six-month time period between the protected activity and the adverse employment action "with other evidence." No. 22-1776, 2023 WL 3270899, at *4 (6th Cir. May 5, 2023). The court reviewed "[s]trategy" emails from defendants that "plotted" and "express[ed] [defendants'] desire to fire [plaintiff] for her opposition to [discriminatory] treatment[,]" despite the plaintiff having "maintained a clean record with her superiors." *Id*. at *1, *4. The court also noted that the university "fail[ed] to investigate [the

plaintiff's] concerns" that the defendants "illegally refused to accommodate" an employee's disability. *Id*. at *6. The court ultimately inferred causation because "the timing work[ed] in tandem with [the plaintiff's] 'other indicia [of retaliation].'" *Id*. at *5 (quoting *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020)).

Here, and unlike in *O'Neill* and *Zarza*, there are no other specific "indicia [of retaliation] to support a causal connection" between Joe's alleged protected activity—his complaint about the all-male invitation to Reds Dream Week in August 2020—and the adverse employment action—his termination from JTM in February 2021. *Id*. Although Joe did meet with Tony, Jack, and Jerry on February 6, 2021, the "meeting lasted less than three minutes" and was followed shortly thereafter with the proffering of a "proposed Settlement Agreement and General Release," a "rewarding way out of the situation" which would have provided Joe with "his annual salary of $225,300.00." Doc. 29, ¶ 85; Doc. 29-45, PageID 887. It strains credulity to suggest that this meeting to tender the release agreement would have been materially adverse to Joe. While it is conceivable that Joe was retaliated against because of his opposition to sexual discrimination, Joe has not *plausibly* pled this claim. Joe has not "provide[d] other indicia to support a causal connection" between his opposition to the alleged sexual discrimination and his February 2021 termination from JTM. *Kenney*, 965 F.3d at 449. Thus, Joe has failed to state a Title VII retaliation claim for opposition to sexual discrimination.

### C.   Religious Discrimination Under O.R.C. §4112.02(A) Against All Defendants

Joe asserts in Count Four that Defendants violated his "civil rights by discriminating against him based upon religion and by imposing their religious tithing beliefs which resulted in significant involuntary charitable contributions of a portion of Joe's shareholder

distributions to Catholic charities and organizations as directed by Tony." Doc. 29, ¶ 126. Specifically, Joe avers that his "rejection of his brothers' religious beliefs caused Tony to systematically remove Joe from his employment responsibilities . . . eliminat[e] of Joe as a vice president of the company, [and] . . . exclu[de] Joe from the executive leadership team." Doc. 36, PageID 1065. Joe alleges that the discrimination culminated when Defendants "wrongfully terminated and discriminated against [him] on or about February 12, 2021, based upon their religious convictions." Doc. 29, ¶ 127.

Defendants move to dismiss the claim, arguing that it is "barred on the basis of res judicata and collateral estoppel under Ohio law" because it is "based on the charitable donations that were previously the subject of Joe Maas's prior suit against the Maas Defendants." Doc. 31, PageID 982. Defendants maintain that this claim "also fails for want of an adverse employment action." *Id*. Defendants also assert that the "alleged 'involuntary charitable contributions' cannot constitute an adverse employment action and [therefore] cannot support Joe Maas's claim for religious discrimination" under Ohio law. *Id*. at PageID 991.

Joe counters that the alleged discrimination was not JTM's charitable giving program but was instead his wrongful "terminat[ion] on February 12, 2021, based upon his brothers' religious convictions." Doc. 36, PageID 1069. Furthermore, Joe maintains that, in addition to the 2021 discriminatory termination, Count Four encompasses the 2021 Corporate Resolution, which Joe avers is also a form of religious discrimination. *Id*. at PageID 1070. Joe claims that by re-instituting the 10% charitable contribution level, Defendants reimposed "their religious tithing beliefs[,] which resulted in involuntary charitable contributions of a portion of Joe's shareholder distributions to Catholic charities and organizations directed by

Tony." *Id*. Joe alleges that because the 2021 Corporate Resolution "was not implemented and therefore not an issue before the state courts in 2019 and 2020" and is "significant[ly] differen[t]" compared to the 2017 Corporate Resolution, this shareholder distribution claim is not barred by preclusion. *Id*.

The Court begins by offering two observations about the correct legal framework for analyzing Joe's allegations. *First*, federal caselaw interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq*., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112. *Republic Steel v. Ohio Civil Rights Comm.*, 44 Ohio St.2d 178 (1975); *Weiner v. Cuyahoga Community College District*, 19 Ohio St.2d 35 (1969). Therefore, the Court will rely on Title VII caselaw in determining whether Joe "has stated plausible claims for relief under both Title VII and the Ohio Civil Rights Act." *Gortemiller v. Tyson Foods, Inc.*, No. 1:23-cv-514, 2024 WL 2186328, at *4 (S.D. Ohio May 15, 2024).

*Second*, the Sixth Circuit has recently instructed that a Title VII plaintiff need not "allege specific facts establishing a prima facie case of discrimination in [his] complaint." *Savel v. MetroHealth System*, 96 F.4th 932, 943 (6th Cir. 2024). Rather, a Title VII plaintiff must merely "plausibly allege that [he was] . . . treated differently because of [his] religion." *Id*. And with guidance from the Sixth Circuit's decision in *Amos v. Lampo Grp.*, the scope of religious discrimination under Title VII, and consequently the Ohio Revised Code, encompasses religious nonconformity claims, which can occur when a "decision [is made] by an employer to fire an employee whose religious views or conduct is inconsistent with the religious views of his employer." No. 24-5011, 2024 WL 3675601, at *2 (6th Cir. Aug. 6, 2024).

20

With this context, the Court finds that Joe has stated a cognizable claim for religious discrimination under O.R.C. §4112.02(A)[6] for the same reasons that the Court holds that Joe has stated a cognizable claim for religious discrimination and retaliation under Title VII.[7] In a December 21, 2019 email, Tony wrote:

> This has come down to one thing Jtm unity of vision and mission. Vision ongoing growth and leader kettle business in America. Mission a catholic family that has pledged its company to be a legacy company not for sale that Jtm would be a light to the world through the Jtm way starting with serving God and His people. So all this boils down to jerry Jack Tony are committed to this mission and vision. Joe maas has completely different one … joe has always been valued for his manufacturing [know] how but is isolated dictator way is not compatible with the Jtm way.

Doc. 29, ¶ 68. Tony expressly indicated that Joe, despite "always [having] been valued for his manufacturing [know] how . . . is not compatible with" JTM, at least in part due to his opposition to JTM's mission to "serv[e] God and His people." *Id*. Thus, construing the Amended Complaint in the light most favorable to Joe and accepting the underlying allegations as true, this Court finds that Defendants, by terminating Joe from his employment with JTM, discriminated against Joe on account of his nonconformity with Defendants' religious practices in violation of O.R.C. §4112.02(A).

Defendants assert that preclusion doctrines bar Joe from asserting this claim. Doc. 31, PageID 984. As is the case with Count One, Joe's claim rests in part on Defendants' alleged

---

[6] The statute provides, in part:

> It shall be an unlawful discriminatory practice:

> (A) For any employer, because of the race, color, **religion**, sex, military status, national origin, disability, age, or ancestry of any person, **to discharge without just cause**, to refuse to hire, **or otherwise to discriminate** against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter **directly or indirectly related to employment**.

Ohio Rev. Code §4112.02(A) (emphasis added).

[7] *See* Part III.A., *supra*.

systematic removal of his "employment responsibilities," much of which occurred throughout the state court proceedings between 2016 and 2019. Doc. 36, PageID 1065. Defendants argue that, to the extent that Joe's claim in federal court is based on those occurrences which arose during the initial state court proceedings, it would be barred by res judicata because such a claim "could have been litigated in the first [state court] action." *Hapgood*, 127 F.3d at 493. This Court agrees. Indeed, this federal action "involve[es] the same parties" and "aris[es] out of the transaction or occurrence that was the subject matter of the previous [state court] action," whereby Joe previously asserted that Defendants "unfairly deprive[d] [him] of corporate opportunities" and "retaliated against him by orchestrating his removal as Vice President of Engineering in August, 2017." *Id*.; Doc. 31-1, PageID 1028.

Joe's claim is also precluded to the extent that he avers that he is "a victim of religious discrimination by JTM and his brothers [because Defendants] impos[ed] their religious tithing beliefs, which resulted in involuntary charitable contributions of a portion of Joe's shareholder distributions." Doc. 36, PageID 1070. Joe argues that the shareholder distribution claim is not barred "because the February 18, 2021 resolution was not implemented and therefore not an issue before the state courts in 2019 and 2020." *Id*. Further, Joe asserts that there is a "significant difference" between the 2017 Corporate Resolution, "which reduced charitable contributions by JTM from 10% to 2% with 2% of the charitable recipients being equally decided by the four Maas brother shareholders," and the 2021 Corporate Resolution, "which increased the contributions to 10%, but only permitted Tony to determine where the 10% donations would be awarded." *Id*. But Joe does not cite to a single authority buttressing this argument, nor does he explain why this "significant difference" would dispel preclusive effect. While the Court recognizes that there is a *technical* difference between the two resolutions, the

Court is unconvinced that the difference is so "significant" as to wholly sidestep the obligation under which Joe must have raised this argument (that the involuntary charitable contributions themselves constitute religious discrimination) in the prior state court action. And the Court is also hard-pressed to conclude that the February 18, 2021 Corporate Resolution had a bearing on Joe's employment when Joe was terminated nearly a week prior, on February 12, 2021. Doc. 38, PageID 1092.

Nonetheless, as is the case with Count One, Joe's claim in Count Four ultimately survives because he plausibly alleges a new adverse employment action—his February 2021 termination from JTM—that has not yet, nor could have been, conclusively adjudicated upon by a court of competent jurisdiction. Therefore, this claim under O.R.C. §4112.02(A) shall be limited to Defendants' post-2019 alleged religious discrimination against Joe, culminating in Joe's termination from JTM in February 2021. This claim does not encompass the alleged systematic removal of Joe's employment responsibilities with JTM before 2019. Nor is this claim to be based solely on the allegation that JTM's tithing requirement is religious discrimination *per se*.

### D. Retaliation for Opposition to Religious Discrimination Under O.R.C. §4112.02(I) Against All Defendants

In Count Five, Joe claims that Defendants "retaliated against [him] for opposing the Defendants' religious discrimination conduct by imposing their tithing beliefs upon Joe and refusing to accommodate his belief that tithing should be done on an individual basis and not corporately at his expense." Doc. 29, PageID 620. Joe asserts that he "was terminated . . . because of his opposition to JTM's mission." Doc. 36, PageID 1075.

Defendants move to dismiss the claim, arguing that because Joe only objected to the *amounts* of the charitable giving program, and not "that the program [itself] constituted

23

unlawful religious discrimination," his complaints did not qualify as protected activity under O.R.C. §4112.02(I).[8] Doc. 31, PageID 995. Further, Defendants contend that because JTM's charitable giving program "does not implicate discriminatory *employment* practices," any opposition by Joe to the charitable giving practices "cannot constitute opposition to 'any unlawful discriminatory practice defined in' O.R.C. §4112.02." *Id.* at PageID 996. In other words, Defendants argue that JTM's charitable giving practice is not a prohibited discriminatory practice under O.R.C. §4112.02, and therefore, Joe has not stated a claim under the statute. *Id.* at PageID 995.

Defendants' exclusive focus on the charitable giving program as the allegedly unlawful discriminatory practice is misplaced. Joe alleges that the charitable giving program was a symptom of a broader culture and atmosphere of religious discrimination, which manifested itself through other discriminatory and retaliatory acts. This Court holds that Joe has pled sufficient facts from which one can plausibly infer that the Maas Defendants imposed their religious beliefs on Joe, that Joe opposed the Maas Defendants' religious beliefs, and that the Defendants retaliated against Joe because of his opposition to and noncompliance with their religious views.

"To establish a prima facie case of retaliation under [O.R.C. §4112.02], the plaintiff must show that 1) he engaged in a protected activity; 2) the protected activity was known to

---

[8] The statute provides, in part:

It shall be an unlawful discriminatory practice:

(I) For any person to discriminate in any manner against any other person because that **person has opposed any unlawful discriminatory practice** defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

Ohio Rev. Code §4112.02(I) (emphasis added).

defendants; 3) the defendants took adverse employment action against the plaintiff; and 4) there is a sufficient causal connection between the protected activity and the adverse action." *Longoria v. Autoneum N. Am., Inc.*, No. 3:14-cv-2648, 2015 WL 6658675, at *6 (N.D. Ohio Oct. 30, 2015). "An employee's activity is 'protected' for purposes of R.C. 4112.02(I) if the employee has 'opposed any unlawful discriminatory practice' (the 'opposition clause') or 'made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code' (the 'participation clause')." *Veal v. Upreach, L.L.C.*, 2011-Ohio-5406, ¶ 18 (citing *HLS Bonding v. Ohio Civ. Rights Comm.*, 2008-Ohio-4107, ¶ 15 (10th Dist.)). To engage in protected opposition activity, a plaintiff must make an "overt stand against suspected illegal discriminatory action." *Ksiazek v. Columbiana Cnty. Port Auth.*, 2021-Ohio-1267, ¶ 64 (citation omitted). The opposition clause covers conduct such as "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer—e.g., former employers, union, and co-workers." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).

The Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White* made clear that the "adverse employment action" requirement in the retaliation context is not limited to an employer's actions that affect the terms, conditions, or status of employment, or those acts that occur in the workplace. 548 U.S. 53, 62–63 (2006). The retaliation provision instead protects employees from conduct that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 54 (citation omitted); *see also Hughes v. Miller*, 181 Ohio App.3d 440, 447 (8th Dist. 2009) ("Ohio's anti-retaliation law has a

25

broader scope than Title VII because it does not limit coverage to people in an employer-employee [relationship].").

With this guidance, the Court holds that Joe has plausibly pled a claim of religious discrimination and retaliation under O.R.C. §4112.02. Building off of the evidence previously adduced, the Court also relies on a May 21, 2019 email, where Tony wrote that:

> **[T]he straw that broke the back is when joe stopped tithing** . . . **joe made me take down the seven deadly sins that I had posted in our office**, it remains in our sales department, we cannot ever separate our walk with our Lord from our business . . . .

*Id*. at ¶ 64 (emphasis added).

This evidence, as well as the evidence referenced in Sections III.A and III.C above, demonstrates that Joe has plausibly pled a prima facie case of religious discrimination and retaliation. *First*, the evidence satisfies the protected activity prong by suggesting that Joe spoke out against JTM's charitable giving program and a company culture of religious imposition. *Second*, the evidence conveys that Defendants knew about Joe's opposition to the alleged imposition of religious beliefs on Joe, who at the time was an "employee of JTM." *Id*. at ¶ 3. *Third*, Defendants took adverse employment action against Joe in February 2021 by terminating him from JTM—an action that would likely have "dissuaded a reasonable worker from making or supporting a charge" of religious discrimination. *Burlington*, 548 U.S. at 54. *Fourth*, the causal connection element is satisfied because, as Jack and Jerry admit, "one of the reasons for Joe's [February 2021] termination [was] that [Joe] didn't accept the JTM mission which is religious tithing." Doc. 29, ¶ 98. Especially when coupling Jack and Jerry's admissions with Tony's statement that "the straw that broke the back is when [Joe] stopped tithing," Joe has plausibly pled a claim under O.R.C. §4112.02 for (1) discrimination because of religious non-conformity, and (2) retaliation because of noncompliance with the Maas

26

Defendants' religious beliefs. *Id*. at ¶ 64. But again, this claim under O.R.C. §4112.02(I) shall be limited to Defendants' post-2019 alleged religious discrimination against Joe, including their failure to accommodate Joe's opposition to the tithing practices, and to Defendants' post-2019 alleged retaliations against Joe, culminating in his termination from JTM in February 2021. This claim does not encompass the pre-2019 removal of Joe's employment responsibilities with JTM. Nor is this claim to be based solely on the allegation that JTM's tithing requirement is religious discrimination *per se*.

### E. Retaliation for Opposition to Sexual Discrimination Under O.R.C. §4112.02(A), (I) Against All Defendants

In Count Six, Joe asserts that he was "terminat[ed]" on February 12, 2021 due to his opposition to "Tony's unlawful gender animas [*sic*] against females and homosexuals." Doc. 29, ¶ 136. Defendants move to dismiss the count, arguing that "the nearly six-month lag between Joe Maas's alleged most recent complaint about gender discrimination in August 2020 and his termination in February 2021" defeats a claim for retaliation because the lack of temporal proximity demonstrates a lack of a causal connection between the two events. Doc. 38, PageID 1101.

The Court agrees with Defendants. The Court finds that Joe has not stated a cognizable claim for retaliation for opposition to sexual discrimination under O.R.C. §4112.02 for the same reasons that the Court found that Joe did not state a cognizable claim for retaliation for opposition to sexual discrimination under Title VII. *See* Part III.B., *supra*.

### F. Breach of Fiduciary Duty for JTM's Charitable Giving Practices and Self-Dealing Against All Defendants

In Count Eight, Joe alleges that Defendants breached their fiduciary duties by maintaining charitable giving practices at JTM whereby millions of dollars were "given away"

despite JTM's outstanding debts to "third party financial institutions for obligations relating to its capital expenditures." Doc. 29, ¶ 153. Joe asserts that Tony, Jack, and Jerry "breached the fiduciary duty to Joe by taking 8% of Joe's JTM net pre-tax distribution in 2015 and 2016 and tithing it to Catholic charities and organizations over Joe's objection." *Id.* at ¶ 147. Moreover, Joe claims a breach of fiduciary duty in 2021, when JTM, at the direction of Tony, "gave away almost $3.5 million dollars to charity … in violation of the 2021 Corporate Resolution because [the donations] exceeded the 10% level." *Id.* at ¶ 150. Additionally, Joe avers that in 2022 and 2023, JTM, at the direction of Tony, again gave away more than five million dollars in charitable contributions, which instead should have been "distributed to Joe and/or The Trusts as shareholder distributions." *Id.* at ¶¶ 151–53.

Separately, Joe also alleges that Tony and Jerry engaged in self-dealing "[o]ver the course of the last several years" by using funds "pilfered from Joe and The Trusts" to pay expenses and real estate taxes for an Ohio limited liability company, Pentecost Properties LLC, of which Tony and Jerry are the sole members. *Id.* at ¶ 156. Similarly, Joe asserts a self-dealing claim against Tony, whom he alleges would "take[] funds that would otherwise be distributed to Joe and The Trusts and use[] them for non-charitable purposes," such as by using "the 'charitable contribution' money to tip servers at Jeff Ruby's." *Id.* at ¶ 157.

Defendants move to dismiss the claim, arguing that it is "barred on the basis of res judicata and collateral estoppel under Ohio law" because this claim is "based on the charitable donations that were previously the subject of Joe Maas's prior suit against the Maas Defendants." Doc. 31, PageID 982. Defendants further assert that the claim, based on the charitable contributions JTM made in 2015 and 2016, is barred by the applicable statute of limitations. *Id.* at PageID 989.

The Court finds that Joe has not stated a cognizable claim upon which relief may be granted. The claims for a breach of fiduciary duty for Defendants' charitable giving in 2015 and 2016 were the subjects of the previous state court adjudications and thus are precluded from being brought in this federal action. [9] *Maas v. Maas*, 2020-Ohio-5160, ¶¶ 39–66 (1st Dist.). As it relates to the alleged breach of fiduciary duty because of the reinstitution of the 2021 Corporate Resolution, Joe attempts to redeem his claim by arguing that it is "not barred by res judicata because if Tony and his brothers wish to donate their shareholder distributions to charity in order to achieve the 10% JTM distribution level, they can easily meet that goal without taking Joe and the Trusts' distributions." Doc. 36, PageID 1071. That argument has no bearing whatsoever on the elements of res judicata.

Here, the crux of Joe's breach of fiduciary duty claim is that the post-2021 charitable contributions are "excessive" and "serve[] no legitimate corporate purpose." Doc. 29, ¶ 15. But the court in the preceding state action squarely addressed and disposed of Joe's contention that the Maas Defendants breached their fiduciary duties because the charitable contributions were "excessive" and "self-serving." *Maas*, 2020-Ohio-5160, at ¶ 8. Likewise, the court considered and adjudicated upon Joe's previous "claims that Defendants' charitable giving [was] excessive and a breach of fiduciary duty." *Maas v. Maas*, Hamilton C.P. No. A1705836, 4 (Aug. 28, 2019).

Moreover, Joe's argument that the post-2021 "donations directly affect[ed] the distributions to Joe and/or the Trusts" does not constitute a new, unalleged injury that renders cognizable his refashioned claim for relief. Doc. 36, PageID 1070. Joe realleges the

---

[9] Joe also concedes that "any claims that may have existed in 2015 and 2016 are barred by the four-year statute of limitations." Doc. 36, PageID 1072 n.4.

*same* injury here—that JTM's "excessive" charitable contributions resulted in the depreciation of his shareholder distributions—that he did in his previous complaint in state court.[10] Doc. 31-1, PageID 1001. Admittedly, the 2021 Corporate Resolution, which "resinstitute[d] the 10% pre-tax tithing distribution to Catholic charities and organizations," was not a subject of the previous state court actions. Doc. 29, ¶ 148. But another court dealing with the same Maas family dispute has already reckoned with Joe's claims about the charitable giving program and held that "[e]ven at the 10% rate, the directors and officers' commitment to charitable giving is not a breach of fiduciary duty." *Maas*, Hamilton C.P. No. A1705836, at 4. Indeed, that court went on to state that "[c]orporations are authorized to 'make donations for the public welfare or for charitable, scientific, or educational purposes[,]'" and that "'community and societal considerations' are specifically listed as factors to consider for directors in considering the best interest of the corporation." *Id.* (citing R.C. 1701.13(D), (F)). This Court agrees with that finding and declines to disturb that conclusion or undertake a new analysis on whether the charitable giving program constitutes a breach of fiduciary duty.

Joe also claims that the charitable contributions are a breach of fiduciary duty because they were made "in violation of the 2021 Corporate Resolution." Doc. 29, ¶ 150. But Joe does not cite to a single authority "recognizing a separate claim under Ohio law for breach of fiduciary duties arising from violations of internal corporate policies." *See Brosz v. Fishman*, 99 F.Supp.3d 776, 788 (S.D. Ohio 2015) (dismissing a breach of fiduciary claim contending that

---

[10] Joe also claims that collateral estoppel is inapplicable here because "the Trusts were not a party to the previous state court cases." Doc. 36, PageID 1072. It is well established that collateral estoppel applies to parties to the first lawsuit, as well as those in *privity* with them. *See Martin v. Bank of New York Mellon Corp.*, 2021 WL 5831097, at *3 (6th Cir. Dec. 9, 2021). A person or party is in privity with another if he or she "succeeds to an estate or an interest formerly held by another." *Thompson v. Wing*, 70 Ohio St.3d 176, 184 (1994) (citations omitted). This Court finds that, although LCNB National Bank was not a party to the previous state court cases, it nevertheless is in privity with Joe as a "successor trustee for the irrevocable trust of Joseph R. Maas . . . and Robin P. Maas." Doc. 29, PageID 580.

defendants violated the company's corporate governance guidelines by not aligning their own interests with those of the company's shareholders).

Joe's conclusory self-dealing allegations fare no better. The elements of a breach of fiduciary duty claim are (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom. *Harwood v. Pappas & Assoc., Inc.*, 2005-Ohio-2442, at ¶ 26 (8th Dist.). Engaging in self-dealing is indeed a breach of fiduciary duty. *Universal Real Est. Sols., Inc. v. Snowden*, 2014-Ohio-5813, at ¶ 45 (9th Dist.). However, Joe does not plausibly allege any *damage* to him resulting from Tony and Jerry's purported self-dealing, other than his conclusory assertion that they injured him in the abstract by having used funds "in part . . . pilfered" from Joe and the Trusts. Doc. 29, ¶ 156. This allegation is lacking because Joe has not plausibly pled the essential element of damages to the breach of fiduciary duty claim. *Newcomer v. Natl. City Bank*, 2014-Ohio-3619, at ¶ 76 (6th Dist.).

### G. Breach of Fiduciary Duty for Wrongful Termination Against All Defendants

In Count Nine, Joe alleges that his February 12, 2021 termination from JTM was "wrongful" and "constitutes a breach of fiduciary duty [because] there was no legitimate purpose for his termination." Doc. 29, PageID 626. Joe asserts that "JTM is liable" for his wrongful termination "committed by Tony, Jack, and Jerry" because the Maas Defendants were acting "as agents of JTM." Doc. 37, PageID 1084. Defendant JTM moves to dismiss the claim, arguing that it fails as a matter of law because, as a corporation, JTM does not owe a shareholder a fiduciary duty. Doc. 32, PageID 1051. Although Joe also asserts this claim against Tony, Jack, and Jerry, the individual Maas Defendants have not disputed this count against them.

Joe's claim against JTM is not cognizable because "[t]here is not, and could not conceptually be any authority that a corporation as an entity has a fiduciary duty to its shareholders." *Radol v. Thomas*, 772 F.2d 244, 258 (6th Cir. 1985) (citing *Jordan v. Global Natural Resources*, 564 F. Supp. 59, 68 (S.D. Ohio 1983) ("We conclude, however, that a corporation as an entity has no fiduciary duty to its shareholders as a matter of law.")). Similarly, Joe's claim of vicarious liability—that "JTM is liable of [*sic*] the actions of its agents"—also fails as a matter of law. Doc. 29, ¶ 162. Joe does not cite to a single case "in which a corporation has been held vicariously liable to its shareholders for its directors' breach of fiduciary duty." *Radol*, 772 F.2d at 259. Indeed, that result would be "flatly inconsistent with the rationale of vicarious liability, since it would shift the cost of the directors' breach from the directors to the corporation and hence to the shareholders, the class harmed by the breach." *Id*. The two cases that Joe *does* reference for the proposition that a corporation can be held vicariously liable for the conduct of its officers are inapposite because they do not even concern, let alone mention, "fiduciary duty." *See e.g.*, *Wille v. Hunkar Lab., Inc.*, 132 Ohio App.3d 92 (1st Dist. 1998) (assessing claims brought under Title VII, R.C. Chapter 4112, common law sexual harassment, and constructive discharge); *see also Am. Ins. Grp. v. McCowin*, 7 Ohio App.2d 62 (7th Dist. 1966) (ruling on whether plaintiff's appeal on claims of tortious liability and respondeat superior was barred by the statute of limitations).

Thus, Joe's claim for wrongful termination is dismissed as to JTM. Importantly, because Tony, Jack, and Jerry have not disputed or contested this count in their Motion to Dismiss, this claim still stands against the individual Maas Defendants.

## H. Conversion Claim Against All Defendants

In Count Ten, Joe alleges that Defendants "wrongfully exercis[ed] dominion or control of Joe's and the Trust's shareholder distributions, and with[held] Joe's salary and benefits from JTM." Doc. 29, ¶ 167. Without indicating a specific time period in which the acts of conversion allegedly occurred, Joe claims "an amount not less than $5,000,000" in damages, which Joe asserts are "specific and identifiable funds" consisting of "25% of the net pre-tax profits of JTM . . . his salary, bonuses and benefits." *Id*. at ¶ 168.

Yet again, Joe's claim lacks an essential element. "[T]he elements of conversion are: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Gascho v. Glob. Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 700 (S.D. Ohio 2012). Money is generally considered intangible property that cannot be subject to conversion unless "specifically identified monies are at issue." *Id.* To be specifically identifiable, money must be earmarked, sequestered, or physically set aside. *Farris v. U.S. Fin. Life Ins. Co.*, No. 1:17-cv-417, 2018 WL 2088284, at *4 (S.D. Ohio May 4, 2018). And importantly, a claimant must assert that there was "an obligation to deliver the specific money in question." *Id*. Further, an allegation that a "sum certain" is owed is different from an allegation that segregated, identifiable money has been converted. *Gascho*, 863 F. Supp. 2d at 700.

Joe alleges at most here that sums certain—not specific and identifiable funds—are owed. Joe asserts that "Defendants' conversation [*sic*] of Joe's salary, the Separation Agreement and Release ("Release") presented to Joe on February 6, 2021, identifies a specific sum." Doc. 36, PageID 1079. But Joe does not also allege—as he is required to—that Defendants had an "obligation" to segregate these sums allegedly owed to him. *Farris*, 2018

WL 2088284, at *4. The February 6, 2021 Release upon which Joe bases his claim was expressly tendered to Joe as an "offer[]." Doc. 29-45, PageID 887. While the Release does have the signatures of Tony, Jack, and Jerry, it critically lacks the signature of the offeree, Joe. *Id.* Additionally, one of the conditions of the Release was for Joe to "resign his employment with JTM," a condition that was never fulfilled because Joe "refus[ed] to resign" when presented with the Release. *Id.*; Doc. 29, ¶ 88. Thus, the offer never converted into a signed, executable document that would have articulated and subsequently animated an obligation by Defendants to set aside these sums allegedly owed to Joe. By not pleading the existence of a duty by Defendants, Joe has not stated a cognizable claim for conversion.

## IV.    CONCLUSION

For the reasons stated herein, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Partial Motions to Dismiss Plaintiffs' Amended Complaint. Doc. 31, 32. The Motions to Dismiss are **DENIED** as to Counts One, Four, and Five, which shall be limited to Defendants' post-2019 alleged religious discrimination against Joe, including their failure to accommodate Joe's opposition to the tithing practices, and to Defendants' post-2019 alleged retaliations against Joe, culminating in his termination from JTM in February 2021. These surviving claims do not encompass the pre-2019 removal of Joe's employment responsibilities with JTM. Nor are these claims to be based solely on the allegation that JTM's tithing requirement is religious discrimination *per se*. The Motions to Dismiss are **GRANTED WITH PREJUDICE** as to all other claims that the parties have so briefed and disputed.

**IT IS SO ORDERED.**

March 13, 2025

Jeffery P. Hopkins
United States District Judge

34