IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOSEPH R. MAAS, *et al.*,                      :
                                               :
   *Plaintiffs*,                :  Case No. 1:23-cv-76
                                               :
v.                                             :  Judge Jeffery P. Hopkins
                                               :
JTM PROVISIONS COMPANY, INC.,                  :
*et al.*,                                      :
                                               :
   *Defendants*.                 :

---

## OPINION AND ORDER

---

  Plaintiff Joseph R. Maas ("Joe" or "Plaintiff")[1] brings this federal lawsuit in a series of three—two others filed previously in state court—against his brothers, Anthony A. Maas ("Tony"), John T. Maas, Jr. ("Jack"), Jerome T. Maas ("Jerry") (the "Maas Defendants") and their family-owned company, JTM Provisions Company, Inc. ("JTM" or the "Company") (collectively, "Defendants"). For years, Joe has been at odds with the Defendants over JTM's corporate governance and board decision making, including the Company's continuation of its longstanding charitable giving program. These disputes eventually led to Joe's termination from JTM, which he now claims was based on religious discrimination. The Court is left to cut this corporate and familial Gordian Knot in the context of Joe's claims of alleged religious discrimination. It is a delicate task, and the Court undertakes it knowing that any true reconciliation and restoration of familial relations among

---

[1] Plaintiff LCNB National Bank ("LCNB") is the duly appointed successor trustee of the irrevocable trusts of Joe Maas and Robin P. Maas (collectively, "the Trusts") and is a party in interest for the claims asserted by the Trusts against Defendants. Am. Compl., Doc. 29, ¶ 4. The Maas Defendants indicate that this Court's dismissal of Joe's "breach of fiduciary duty claim based on JTM's charitable giving effectively dismissed LCNB as a plaintiff." Doc. 90, PageID 2855 n.2. Joe does not contest this assertion.

the four brothers will not come from any judicial decision, but rather from the brothers' own embrace of forgiveness, self-reflection, and grace, predicated on the very faith instilled in them by their parents—a faith that each of them still practices by and large in one form or another.

Pending before the Court are three summary judgment motions: JTM's Motion for Summary Judgment (Doc. 89), the Maas Defendants' Motion for Summary Judgment (Doc. 90), and Plaintiffs' Motion for Summary Judgment (Doc. 91). In their respective motions, Defendants seek to have all remaining claims asserted against them dismissed.[2] In his motion, Joe asks for dismissal of Defendants' affirmative defenses. For the reasons below, the Maas Defendants' Motion for Summary Judgment (Doc. 90) is **GRANTED** in its entirety, and JTM's Motion for Summary Judgment (Doc. 89) is **GRANTED IN PART** and **DENIED IN PART**. Joe's mixed-motive Title VII religious discrimination claim survives as to JTM. The Court will address any affirmative defenses relevant to that claim in a separate order.

## I.    BACKGROUND

The facts of this case were set forth in this Court's Opinion and Order (Doc. 66) addressing Defendants' Partial Motions to Dismiss (Docs. 31, 32), so it is not necessary to reiterate them here. The Court will instead incorporate the facts as necessary to address the arguments asserted in the parties' respective Motions for Summary Judgment.

Nine claims in Joe's Amended Complaint remain: Count 1, Count 3, Count 4, Count 5, Count 7, Count 9, Count 11, Count 12, and Count 13.[3] These claims are as follows:

---

[2]   In its motion, JTM agrees with and incorporates by reference the arguments set forth in the Maas Defendant's Motion for Summary Judgment. Doc. 89, PageID 2836–37.

[3]   In its Opinion and Order, this Court dismissed the following claims from Joe's Amended Complaint: Count 2 (Title VII claim gender discrimination), Count 6 (state-law claim for gender discrimination), Count 8 (state-law claim for breach of fiduciary duty), and Count 9 as to JTM only (state-law claim for breach of fiduciary duty as a result of wrongful termination) and Count 10 (state-law claim for conversion). Doc. 66.

- Count 1: Religious discrimination and retaliation in violation of Title VII against JTM only. This claim is limited to Defendants' post-2019 alleged discrimination against Joe.

- Count 3: Violations of ERISA against JTM and the Maas Defendants.

- Count 4: Religious discrimination in violation of O.R.C. § 4112.02(A) against JTM and the Maas Defendants. This claim is limited to Defendants' post-2019 alleged discrimination against Joe.

- Count 5: Retaliation in violation of O.R.C. § 4112.02(I) against JTM and the Maas Defendants. This claim is limited to Defendants' post-2019 alleged discrimination against Joe.

- Count 7: Aiding and abetting conspiratorial actions in violation of O.R.C. § 4112.02 against JTM and the Maas Defendants.

- Count 9: Breach of fiduciary duty against the Maas Defendants only.

- Count 11: Civil conspiracy against JTM and the Maas Defendants.

- Count 12: Wrongful discharge in violation of public policy against JTM and the Maas Defendants.

- Count 13: Declaratory judgment against JTM and the Maas Defendants.

Doc. 66.

As stated, the Maas Defendants and JTM have each filed a Motion for Summary Judgment (Docs. 89, 90) seeking dismissal of all of the remaining claims asserted against them. Joe filed an omnibus response opposing summary judgment (Doc. 102) to which the Maas Defendants filed a reply. Doc. 107. Contemporaneous with Defendants' motions, Joe also filed a Motion for Summary Judgment (Doc. 91) requesting that the Court dismiss the affirmative defenses. The Maas Defendants and JTM responded (Docs. 99, 101) and Joe filed replies to each (Docs. 108, 109). All these matters are now ripe for consideration.

## II.    STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "'always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

The non-movant cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is *material* if its resolution affects the outcome of an action, and a dispute is *genuine* if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At bottom, the Court must determine whether there is some "sufficient disagreement" that necessitates submitting the matter to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52).

### III.    LAW AND ANALYSIS

> **A. Defendants are entitled to summary judgment on Joe's religious discrimination and retaliation claims (Counts 1, 4, and 5) save for Joe's limited mixed-motive religious discrimination claim against JTM (Count 1).**

In Counts 1, 4, and 5 of the Amended Complaint, Joe asserts federal and state-law claims for religious discrimination and retaliation. The elements and standards for proving religious discrimination and retaliation claims under Title VII and Ohio law are the same, so the Court will consider these claims together. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004); *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016).

> **1. Religious Discrimination and Retaliation under Title VII and Ohio law**

It is unlawful for an employer to discriminate against any individual on the basis of religion. 42 U.S.C. § 2000e-2(a)(1); O.R.C. § 4112.02. So when an employee alleges that he has been discharged in violation of the law, the factual inquiry is whether the employer "intentionally discriminated against the plaintiff" on the basis of religion. *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (citation omitted). That is at the heart of Joe's religious discrimination and retaliation claims in this lawsuit, where he alleges that he was terminated for not conforming to JTM's firmly-held religious convictions, though he too practices Catholicism, the same faith tradition from which JTM's convictions are derived.[4]

---

[4]   To be clear, even though Joe is of the same faith tradition as his brothers, Tony, Jack, and Jerry, this does not preclude a religious discrimination claim. *See Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 78 (1998) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."). Further, to the extent that Defendants question the sincerity of Joe's religious belief, "[c]redibility issues such as the sincerity of an employee's religious belief are 'quintessential fact questions.' As such, they ordinarily should be reserved for the factfinder at trial, not for the court at summary judgment." *EEOC v. Publix Super Mkts.*, 481 F. Supp. 3d 684, 700 (M.D. Tenn. Aug. 20, 2020) (citation omitted).

Joe's claims are multi-faceted. He alleges that, despite performing his job in a competent and capable manner, he was terminated for refusing (1) to execute the Charitable Charter and (2) to agree to the tithing "requirement." He further claims that Defendants failed to accommodate his opposition to their tithing practices. Am. Compl., Doc. 29, ¶¶ 102–04, 126–27. Beyond these allegations, Joe also asserts that he was terminated in retaliation for opposing Defendants' religious convictions, specifically as those convictions relate to JTM's tithing practice.[5] *Id.* ¶¶ 106, 131. To explore all the contours of his claims, the Court will first address Joe's contention that he was discriminated against on the basis of religion before turning to his contention that he was terminated in retaliation.

### i. Religious Discrimination

There are two basic forms of religious discrimination recognized under Title VII jurisprudence in our Circuit: disparate treatment and failure to accommodate. *Sturgill v. Am. Red Cross*, 114 F.4th 803, 811 (6th Cir. 2024). Both theories are at play here. Joe's disparate treatment claims, in part, invoke the traditional single-motive analysis, meaning that Joe alleges an illegitimate reason motivated Defendants' decision to discharge him. But to further complicate matters, Joe also seeks to proceed under a mixed-motive theory for his Title VII disparate treatment claim against JTM, which means that he asserts JTM's decision was motivated by both legitimate *as well as* illegitimate reasons. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). Because Joe relies on direct evidence of discrimination in support of the Title VII mixed-motive argument that he asserts exclusively against JTM, the Court will address it first.

---

[5] "[R]eligion includes all aspects of religious observance and practice, as well as belief," *see* 42 U.S.C. §2000e(j), and courts have recognized that tithing is a religious exercise. *See Johnson v. Wainwright*, No. 2:19-cv-341, 2021 WL 2472929, *2 (S.D. Tex. June 17, 2021).

### 1. Title VII Disparate Treatment (Mixed Motive)

The mixed-motive theory applies in cases "where an adverse employment decision was the product of a mixture of legitimate and illegitimate motives." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 571 (6th Cir. 2003) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 (1989)). A plaintiff can proceed under this theory by demonstrating by a preponderance of evidence, "that [his] protected status was a motivating factor in [his] termination, even though other factors also motivated [his] discharge." *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012); *see Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (citing 42 U.S.C. § 2000e-2(m)). A plaintiff may submit direct or circumstantial evidence to survive summary judgment under the mixed-motive theory. *Id.*

Not every case, however, is entitled to mixed-motive consideration. A plaintiff must give notice of bringing such claims to trigger the analysis. At any rate, this is not a heavy burden. A plaintiff may invoke the mixed-motive analysis, expressly or impliedly, through the complaint or even at the summary judgment stage of proceedings. Joe has properly invoked the mixed-motive analysis here through his Amended Complaint and in response to JTM's summary judgment motion. Am. Compl., Doc. 29, ¶ 107; Doc. 102, PageID 3485–86. *See Ondricko*, 689 F.3d at 649 (plaintiff gave adequate notice of mixed-motive claims in her response to the defendant's motion for summary judgment); *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010) (plaintiff gave adequate notice of mixed-motive claim by alleging pregnancy was a motivating factor in how she was treated and specifying she was bringing mixed-motive claims in a footnote in her summary judgment motion).

The *McDonnell Douglas* burden shifting framework does not apply to Joe's Title VII mixed-motive religious discrimination claim. *White*, 533 F.3d at 400. To survive summary

judgment under the mixed-motive analysis, Joe must "produce evidence sufficient to convince a jury that: (1) [JTM] took an adverse employment action against [him]; and (2) 'race, color, religion, sex, or national origin was a motivating factor' for [JTM's] adverse employment action." *Id*. Joe's "burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support [his] claim." *Id*. Though this is less strenuous than the single-motive analysis, a plaintiff pursuing a mixed-motive claim is restricted to recovering certain forms of relief. Indeed, "a plaintiff asserting a mixed-motive claim is entitled only to declaratory relief, limited injunctive relief, and attorney fees and costs where the employer demonstrates that it would have taken the same employment action in the absence of an impermissible motivating factor." *Spees*, 617 F.3d at 390.

Because there is no dispute that JTM discharged Joe, whether religion was a motivating factor for Joe's discharge is the only issue that remains. See *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007) (citing *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002) (termination qualifies as an adverse employment action)).

Here, Joe offers direct evidence to support his mixed-motive theory, specifically statements made by his brother, Tony, and others on behalf of JTM. Doc. 102, PageID 3489–93. If believed, direct evidence "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014) (citing *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006)). Direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice

8

against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

For a statement to constitute direct evidence, it must be "(1) made by a decision-maker or by an agent acting within the scope of his or her employment; (2) related to the decision-making process; (3) more than merely vague, ambiguous, or isolated; and (4) made proximate in time to the act of termination." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 325 (6th Cir. 2021) (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002)). Despite the many statements he cites, Joe cannot satisfy this "high bar" because all the statements offered by Joe would require a reasonable jury to draw inferences to find that JTM's allegedly discriminatory actions were motivated, at least in part, by unlawful religious discrimination. *Id.* He cannot overcome summary judgment in this way.

Notably, Joe has not asked the Court to consider these statements as circumstantial evidence of discrimination. But the Sixth Circuit has made clear that "whether the plaintiff has presented direct or circumstantial evidence in support of the mixed-motive claim" the same summary judgment analysis applies "in all Title VII mixed-motive cases regardless of the type of proof presented by the plaintiff." *White*, 533 F.3d at 400. And according to the Supreme Court, particularly in relation to discrimination cases, "[t]he reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Desert Palace, Inc.*, 539 U.S. at 100 (quoting *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 508 n.17 (1957)). *See generally, Peyton v. Kellermeyer Co.*, 115 F. App'x 825, 830 (6th Cir. 2004) (explaining that, although a statement did not qualify as direct evidence of

discrimination, the same statement when viewed as circumstantial evidence "could suggest to a reasonable trier of fact" that age was a factor in the plaintiff's discharge).

Thus, although the statements that Joe offers are insufficient as direct evidence, these statements can still be considered as circumstantial evidence of discrimination. *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012). In viewing statements under that lens, a district court should consider factors "such as the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Id.* These factors are closely aligned with the same considerations relevant to deciding whether statements qualify as direct evidence of discrimination. *Pelcha*, 988 F.3d at 325.

Joe cites many statements, but most of them were made by his brother, Tony. There is no question that Tony, JTM's CEO, was in a position to influence the decision to terminate Joe, which weighs in Joe's favor. *Griffin*, 689 F.3d at 595 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998)) ("[D]iscriminatory comments can qualify as evidence that a particular decision was discriminatory if the speaker was 'in a position to influence the alleged decision.'"). Tony's statements were also not isolated, nor were they ambiguous. His statements singled out Joe. And there was a clear theme: that Joe was not aligned with JTM's charitable giving practices that were firmly rooted in the Catholic faith tradition. Tony openly criticized Joe, saying in December 2019 that Joe violated JTM's "most sacred" commitment of tithing. Byrne Decl., Ex. 34, Doc. 98-34, PageID 3253. Tony also said that JTM and the Maas Defendants were at a "critical crossroads" where it was impossible to co-exist with Joe. *Id.* For Joe to be in the JTM partnership, he would need to, among other things, "drop his lawsuit" and be fully committed to the JTM mission and vision centered on "serving God and His people." *Id.* at PageID 3253–54. Tony also reported to

10

others that a "huge part" of Joe's lawsuit was his opposition to JTM's tithing practice and asked that Joe not be included on tithing-related emails because he "is not of one mind heart soul with [JTM's] mission." *Id.* at Ex. 36, Doc. 98-36, PageID 3259. From Tony's perspective, Joe "quit officially as a business partner and a brother 5 years ago" based on his actions. *Id.*

When considering these and other statements in the record, a reasonable jury could infer that Joe's opposition to JTM's charitable giving practices, which are central to JTM's mission and vision and derived from its Catholic beliefs, show that JTM was motivated, in part, to terminate Joe's employment due to his non-conformity with JTM's convictions. Though some of these statements were made more than a year before Joe's discharge, this does not prevent a reasonable jury from drawing the necessary inference under the circumstances of this case. Joe was not just any employee. He was integral to the closely-held family-owned business and owns or controls 25% of the voting stock of JTM, along with his brothers, Tony, Jack, and Jerry. *See* Jerry Maas 3/22/22 Dep., Doc. 77, 72:24–73:3 ("We were family, and, again, we were trying to – Joe was also an owner. It wasn't that simple and easy to just terminate him."). Thus, though the temporal proximity of the comments to Joe's termination is a legitimate consideration, under the facts here, a reasonable jury could find based on the record that, over time, frustrations with Joe's opposition to JTM's charitable practices continued to build, and that, eventually, there was no choice but to terminate Joe for his refusal to conform with JTM's faith-based mission and vision. Indeed, his discharge opened the door to resume charitable contributions at previous levels. Six days after firing Joe, on February 18, 2021, the Board reinstated JTM's pre-tax charitable contribution level to 10% and placed Tony in charge of directing donations. Baverman Decl., Ex. 38, Doc. 87-38, PageID 2761.

In order to survive summary judgment on a mixed-motive claim, Joe need only produce evidence sufficient to convince a jury that his religious non-conformity was *a motivating* factor for his discharge—not necessarily the only factor. *Williams v. Zurz*, 503 F. App'x 367, 375–76 (6th Cir. 2012). He has done so here.[6] But as noted, should Joe prevail on this claim, his recovery will be limited. *Spees*, 617 F.3d at 390.

## 2. Disparate Treatment (Single Motive)

Generally, single-motive religious discrimination claims are treated no differently than other disparate treatment claims. *See Sturgill*, 114 F.4th at 811. A disparate treatment claim, regardless of the type of discrimination, can be proven through direct evidence or circumstantial evidence. But "[d]irect evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds." *Erwin v. Potter*, 79 F. App'x 893, 896–97 (6th Cir. 2003). *See Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) ("Such evidence would take the form, for example, of an employer telling an employee, 'I fired you because you are disabled.'"). None of the evidence that Joe advances qualifies as direct evidence of discrimination because it would require a reasonable jury to draw certain inferences to find that Defendants discriminated against him on the basis of religion.

So where, as here, there is no direct evidence and a plaintiff is attempting to prove religious discrimination through circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies. *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007). Here, this

---

[6] In its Motion for Summary Judgment (Doc. 89), JTM addressed Joe's Title VII claim as it is asserted against JTM only, and incorporated by reference the Maas Defendants' arguments as to Joe's remaining claims. But in its motion, JTM did not discuss, nor acknowledge Joe's mixed-motive theory. Perhaps JTM did not realize that Joe was proceeding under this theory, despite Joe's invocation of it in his Amended Complaint. *See* Am. Compl., Doc. 29, ¶ 107. Even so, Joe argued mixed-motive in his response to JTM's motion, and JTM did not file any reply. Thus, in effect, JTM failed to seek summary judgment on this aspect of Joe's claim.

means that Joe must first produce evidence that shows a prima facie case of discrimination. *See Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308–09 (2025); *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364–65 (6th Cir. 2007). If he succeeds, the burden shifts to JTM to articulate a non-discriminatory reason for its actions. *Tepper*, 505 F.3d at 515. Should JTM satisfy this burden, Joe must then offer evidence that shows Defendants' proffered non-discriminatory reasons are pretext for religious discrimination. *Id.* at 515–16. At the summary judgment stage, where the Court finds itself here, a district court must assess "whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

For most cases, to make out a prima facie case of discrimination, a plaintiff must produce evidence that shows (1) he belonged to a protected class, (2) he was qualified for his position, (3) he suffered an adverse action, and (4) the adverse action occurred under circumstances that support an inference of discrimination. *See Macy*, 484 F.3d at 364–65; *Ames*, 605 U.S. at 308–09. That said, the Sixth Circuit has yet to rule on this subject but a modified framework has emerged in other circuits for religious discrimination claims that are based on a plaintiff's non-conformity with a defendant's religious convictions. *See, e.g.*, *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007); *Shapolia v. Los Alamos Nat. Lab'y*, 992 F.2d 1033, 1038 (10th Cir. 1993); *Owens v. City of New York Dep't of Educ.*, No. 21-2875, 2022 WL 17844279, at *2 (2d Cir. Dec. 22, 2022).[7]

That framework under the rule established in other circuits keeps the traditional burden-shifting scheme but modifies, slightly, the elements necessary to establish a prima facie

---

[7] Other circuits refer to this type of claim as a "reverse religious discrimination claim." The Sixth Circuit instead refers instead to this as a "religious nonconformity claim." *Amos v. Lampo Grp., LLC*, No. 24-5011, 2024 WL 3675601, at *2 (Aug. 6, 2024).

case of discrimination. At bottom, these circuits have "reasoned that the 'protected class' showing required in a traditional race or sex discrimination claim does not apply to this type of nonadherence or [religious non-conformity] claim because 'it is the religious beliefs of the employer, and the fact that [the employee] does not share them, that constitute the basis of the [religious discrimination] claim.'" *Noyes*, 488 F.3d at 1168 (quoting *Shapolia*, 992 F.2d at 1038). With this concern in mind, the Tenth Circuit held in *Shapolia* that a plaintiff asserting a religious non-conformity claim must show: "(1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) [that there is] some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs." *Shapolia*, 992 F.2d at 1038.

The Sixth Circuit briefly discussed the parameters laid out in *Shapolia*, *Noyes*, and *Owens* when it entertained a religious non-conformity claim in *Amos v. Lampo Grp., LLC*, No. 24-5011, 2024 WL 3675601, at *2–3 (Aug. 6, 2024). In *Amos*, however, the Sixth Circuit did not have occasion to apply or scrutinize the modified prima facie elements at the motion-to-dismiss stage where mere plausibility was at issue but nonetheless commented that "it is appropriate to use the employee's refusal to share or comply with the employer's religious belief [] as a proxy for the employee's religion and to show the causal nexus between the discriminatory act and its religious motivation." *Amos*, 2024 WL 3675601, at *2 n.2.

When viewing Joe's religious non-conformity claim in the context of the discussions in *Amos*, *Shapolia*, *Noyes*, and *Owens*, the Court finds that the modified prima facie elements laid out in *Shapolia* are suitable here. Defendants and Joe seem to agree. *See* Doc. 90, PageID

14

2861–62 (citing *Seale v. City of Springfield*, 113 Ohio App. 3d 384, 391 (2d Dist. 1996) (applying prima facie elements in *Shapolia*)); Doc. 102, PageID 3485, 3498 (citing *Seale* and *Shapolia*). The Court will therefore proceed with assessing Joe's claim under that lens.

There appears to be no dispute that Joe satisfies the first two elements of the tripartite test. First, Joe suffered an adverse employment action when Defendants terminated Joe's employment on February 12, 2021. Baverman Decl., Ex. 48, Doc. 87-48, PageID 2799–2800. Second, no party disputes that Joe was qualified for his position at the time of his termination. In considering this factor, Joe's qualifications must not be confused with the variety of complaints and justifications that Defendants made for Joe's discharge. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002). Thus, because no party disputes that Joe's qualifications were satisfactory at the time of his discharge, the second element is also satisfied. *Bolden v. Lowes Home Centers, LLC*, 783 F. App'x 589, 596 (6th Cir. 2019).

For the third element, Joe must offer some evidence to support the reasonable inference that Defendants terminated him because of a discriminatory motive based on his failure to hold or follow their religious beliefs. Similar to his mixed-motive claim, here, Joe relies on statements that were made in relation to his opposition to the charitable practices.

This again harkens us back to certain factors, "such as the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Griffin*, 689 F.3d at 595 (analyzing discriminatory comments in the Title VII context). And here too, much of the same evidence supports the inference that Defendants discharged Joe based on his non-conformity with their religious beliefs, particularly tithing. In email correspondence sent less than a year before Joe's termination, Tony discussed the commitment to tithing in connection with one of JTM's charitable contributions. Byrne Decl.,

Ex. 36, Doc. 98-36, PageID 3259. Tony mentioned the issues with Joe and asked that the recipient "not send emails to us all together" because a "huge part" of Joe's lawsuit related to JTM's tithing practice. *Id.* Tony, in a subsequent email within the same chain, stated that Joe "is not of one mind heart soul with our mission" and that Joe "quit officially as a business partner and a brother 5 years ago. Jack Jerry and I make sure we are still tithing." *Id.*

In yet another email chain later that same year discussing JTM's other charitable commitments, Tony stated: "We have been blessed with a unreal year. God is good. [Jack and Jerry] did not flinch with being *total obedient* to our tithing." *Id.* at Ex. 38, Doc. 98-38, PageID 3264 (emphasis added). These 2020 emails followed a scathing email that Tony sent in December 2019 discussing the many difficulties that Joe presented for JTM given his opposition to JTM's charitable practices, which are central to its mission and vision. In that email, Tony stated that Joe violated JTM's "most sacred" commitment, *tithing*. *Id.* at Ex. 34, Doc. 98-34, PageID 3253–54. And if Joe dropped his lawsuit (which Tony believed to be, in large part, related to JTM's tithing program), then, according to Tony, Joe could be "welcomed [back] into the partnership in a unified way that is in line with our catholic belief [the JTM] way and mission and vision." *Id.* at PageID 3254. This, along with Tony's emphasis on the "total obedience" of Jack and Jerry in discussing JTM's commitment to tithing while, at the same time, criticizing Joe's refusal to fall in line with JTM's mission and vision, *see id.* at Ex. 38, Doc. 98-38, PageID 3264, would permit a reasonable jury to infer that Joe could have remained employed at JTM if he got on board with JTM's tithing practices, which were quite publicly proclaimed to be based on Defendants' religious beliefs.

To satisfy the third element necessary to round out a prima facie case of religious discrimination, Joe need only offer *some* evidence to support the inference that Defendants'

16

actions were taken because of a discriminatory motive based upon Joe's failure to hold or follow their religious beliefs. The statements he offers are enough to clear this hurdle.

Because Joe has established a prima facie case, the burden is now on Defendants to produce a legitimate, non-discriminatory reason for firing him. "This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (citing *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 n.2 (1978) (the employer satisfies its burden if it produces evidence of legitimate nondiscriminatory reasons)); *see also Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (the employer need only "articulate a valid rationale" for terminating the employee).

To that end, Defendants contend that Joe "was terminated as a cumulative result of his ongoing disruptive and unproductive behavior." Doc. 89, PageID 2837; *see also* Doc. 90, PageID 2866. There is sufficient evidence in the record that supports Defendants' contention, and thus establishes that Defendants had legitimate, non-discriminatory reasons for firing Joe.

After enduring Joe's behavior for several years, JTM and the Maas Defendants "collectively decided they finally had enough." Doc. 90, PageID 2866 (quotation and citation omitted). Jack testified that, after managing to keep JTM afloat during a global pandemic, with "no support whatsoever" from Joe, which was preceded by decades of disagreement with him, Jack, Jerry, and Tony "were just wore out, [and] couldn't take it anymore." Jack Maas 3/8/22 Dep., Doc. 75, 78:16–17. Jerry too agreed that the brothers had "[f]inally had enough." Jerry Maas 3/22/22 Dep., Doc. 77, 73:8–10.

The record shows that time and again, Joe demonstrated unprofessional behavior, most often through brazen and aggressive email correspondence delivered in certain instances to all employees. *See, e.g.*, Baverman Decl., Ex. 26, Doc. 87-26, PageID 2739 ("I have been

17

here 50 years, you have been here a few months. I have designed the process to produce the food JTM sells. Why would you insult my intelligence and my competency?"); *id.* at Ex. 29, Doc. 87-29, PageID 2744 ("The level of immorality of decisions by the board continue to shock me."). Joe also refused to cooperate with senior members of the company in completing critical projects and tasks. *See* Jerry Maas 3/22/22 Dep., Doc. 77, 190:12–13 ("He didn't just shirk his responsibilities. He mocked. He did everything besides help."); Sykes Dep., Doc 86, 165:14–166:13 (Joe "refused to" participate). And Joe often took an insubordinate and self-aggrandizing tone toward superiors as well as subordinates. *See, e.g.*, Baverman Decl., Ex. 32, Doc. 87-32, PageID 2748 ("Your disrespect to an owner of the company that you work for is unacceptable. My emails are never ridiculous, untrue, or a waste of time. You may not comment on people's work levels as you have no idea what working long and hard for JTM means."). Board member Greg Sykes testified that, in his experience, had another employee engaged in the insubordinate acts that Joe engaged in, the person would probably have been asked to leave the company or been terminated. Sykes Dep., Doc. 86, 166:23–167:7; 196:23–197:15.

Disruptive and unproductive conduct is a legitimate non-discriminatory reason for termination. *Messenheimer v. Coastal Pet Prods.*, 764 F. App'x 517, 520 (6th Cir. 2019) (finding poor demeanor toward subordinates is a legitimate, nondiscriminatory reason for an adverse employment action); *Mauer v. Deloitte & Touche, LLP*, 752 F. Supp. 2d 819 (S.D. Ohio 2010) (finding a legitimate reason for adverse employment action when superiors found employee "disruptive"); *Franks v. Vill. of Bolivar*, 583 F. App'x 534, 538 (6th Cir. 2014) (finding that lack of professionalism is a legitimate non-discriminatory reason for terminating employment).

Thus, because Defendants have produced legitimate non-discriminatory reasons for Joe's discharge, the burden shifts back to Joe to demonstrate the reasons are pretextual.

To demonstrate that Defendants' proffered reasons for his termination are pretextual, Joe must show that the proffered reasons "(1) [have] no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) [were] insufficient to warrant the challenged conduct." *Haughton v. Orchid Automation*, 206 F. App'x 524, 531 (6th Cir. 2006). Though he does not outwardly say so, Joe appears to primarily argue that Defendants' proffered reasons did not actually motivate the decision to terminate him, and that he was instead terminated for his non-conformity with Defendants' religious convictions.

Joe cites Tony's many statements expressing his frustration with Joe's opposition to the JTM corporate donations program, and claims that the statements collectively demonstrate discriminatory animus and pretext. Doc. 102, PageID 3509. In support, Joe relies on *Ercegovich*, 154 F.3d at 355–56. In that case, the Sixth Circuit commented on the relevance of biased remarks:

> [W]hen assessing the relevancy of an allegedly biased remark where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus.

*Id.* Naturally, based on this pronouncement, Joe seeks to extrapolate from *Ercegovich* to show that the remarks here, in the aggregate, lend to an inference of discriminatory animus towards him. Joe has not persuaded this Court that *Ercegovich* supports his claims, however.

The comments in *Ercegovich* were made explicitly about employment decisions and were directed at personnel at the company and their age: "this company is being run by white haired old men waiting to retire, and this has to change" and "he [did] not want *any employee*

19

over 50 years old on his staff." *Ercegovich*, 154 F.3d at 354 (emphasis added). Here, Tony's comments are of a different nature from the comments in *Ercegovich*. In the statements that Joe relies on, Tony makes no suggestion that agreeing with tithing is a factor in employment for Joe or any employee. In fact, it is undisputed that Defendants modified their position in response to Joe's complaints, and the entire company restructured its charitable contributions program—including a reduction in pretax contributions from 10% to 2%. Doc. 90-1, ¶ 4; Doc. 102-1, ¶ 4. Furthermore, in an email which preceded this policy change, Tony stated, "Joe would get a bonus paycheck for the difference, in my heart of hearts I pray he would give to charity." Byrne Decl., Ex. 17, 98-17, PageID 3214. In *Ercegovich*, the personal views directly related to preferences about employee characteristics. Tony's comments, on behalf of JTM, do not, and the other evidence in the record shows that Defendants were willing to adjust corporate policy to appease Joe at the expense of compromising their convictions.

As stated, the Sixth Circuit in *Ercegovich* also relied on "a backdrop of other evidence of pretext" in determining that the remarks supported an inference of discriminatory animus towards the affected employee. *Ercegovich*, 154 F.3d at 356. For example, the plaintiff supplied testimony which directly contradicted the factual basis of the defendant's proffered reason for the adverse employment action. *Id*. at 354. Here, however, Joe has not supplied any direct or circumstantial evidence that contradicts Defendants' assertions that he was disruptive and unproductive—and instead pivots to other evidence of record. Without that underlying support, the circumstantial evidence here cannot extend, as it did in *Ercegovich*, across the wide chasm between Joe's bald assertions of pretext and the actual evidence in the record.

Joe also argues that "the lapse in time between the alleged articulated reasons for [his] termination and his actual termination make it more likely that [he] was terminated for his

20

refusal to adhere [to Defendants'] religious beliefs." Doc. 102, PageID 3509. He reasons that his opposition to the 2016 expansion project cannot be the actual reason for his termination because, if that were the case, he would have been terminated back then. Ironically, that rationale cuts against Joe because he began to raise concern about JTM's charitable contributions program in late-2016. And rather than terminate Joe at that time, Defendants went to great lengths to appease him, with the Board modifying those practices in February 2017. Although temporal proximity is a relevant consideration in many discrimination cases, it does not help much here. The evidence that both sides seek to rely on spans over a multi-year period. And, as explained earlier, the interpersonal nature of this dispute heightens the complexity of the termination decision. Joe was not only an employee—he was a high-level executive of a family business that he helped manage alongside his brothers, Tony, Jack, and Jerry. In discussing the decision to terminate Joe, Jerry aptly stated: "We were family, and, again, we were trying to – Joe was also an owner. It wasn't that simple and easy to just terminate him." *See* Jerry Maas 3/22/22 Dep., Doc. 77, 72:24–73:3. For this reason, both parties' attempts to argue that temporal proximity weighs in their favor, are unavailing.

As to pretext, Joe further contends that Defendants' proffered reasons shifted over time, which demonstrates that the bases for firing him were pretextual. Joe cites a letter that JTM submitted to the Equal Employment Opportunity Commission ("EEOC") describing the reason for Joe's termination. In that letter, JTM cited poor performance. Doc. 102, PageID 3510–11. Although statements such as these could contribute to finding pretext, *see Saley v. Caney Fork, LLC*, 886 F. Supp. 2d 837, 857 (M.D. Tenn. 2012), the letter here does not demonstrate pretext, or even a shifting rationale for Joe's firing. The term "performance" is broad-encompassing, so JTM's use of the term in a limited manner is not inconsistent with

Defendants' proffered reasons for termination. *Crabbs v. Copperweld Tubing Prods. Co.*, 114 F.3d 85, 89 (6th Cir. 1997) (explaining that, although the employer told the employee that he was being terminated for "poor performance," the term "performance" is "broad" and encompasses a wide range of behavior, such as an employee's attitude).

Additionally, when presented with a similar argument, the Sixth Circuit in *Trapp v. TSS Techs., Inc.*, 485 F. App'x 757, 760–61 (6th Cir. 2012) explained the purpose of the letter that an employer sends as a response to an employee's EEOC charge. Indeed, the purpose is "not to provide a detailed explanation of the circumstances surrounding [the employee's] termination, but rather to broadly deny [his] EEOC charge and highlight aspects of his record inconsistent with the assertions in his charge." *Id.* at 760. Under the facts in *Trapp*, the Sixth Circuit found no evidence of pretext where the employer "neither backtracked nor offered reasons inconsistent with any statements in the letter." *Id.* at 761. So too here. Joe, in his charge, claimed that he performed his duties in a capable and competent manner, and in response, JTM explained that Joe's performance had suffered leading up to his termination. To find that Defendants' proffered reasons, disruptive and unproductive conduct, does not fall within that ambit, would be making a distinction without a difference.

Defendants have cited various examples of Joe's disruptive and unproductive conduct that justified his termination, and Joe has neither addressed this conduct, nor explained how it is not a legitimate reason for termination. *See, e.g.*, Baverman Decl., Ex. 26, Doc. 87-26, PageID 2739; *id.* at Ex. 29, Doc. 87-29, PageID 2744; Jerry Maas 3/22/22 Dep., Doc. 77, 190:12–13; *see also* Sykes Dep., Doc 86, 165:14–166:13; Baverman Decl., Ex. 32, Doc. 87-32, PageID 2748. And even long before Joe's termination, an attorney, acting on behalf of JTM, sent a cease and desist letter to Joe in 2018 addressing the emails that he sent to JTM

22

employees that "appear[ed] to be designed to damage JTM's relationship with its employees, sow dissent among its employees, and undermine the management and Board of JTM." Joe Maas Decl., Ex. 21, Doc. 97-21, PageID 3108. The attorney cast the emails as "disruptive, offensive, and harmful to the morale of JTM employees in violation of Company policy," and advised Joe that further violations would "result in discipline up to and including termination of [his] employment." *Id.* The record shows that Defendants have not wavered in their legitimate, non-discriminatory reasons for terminating Joe, and Joe has not carried his burden of showing that these reasons are pretext for unlawful religious discrimination.

For these reasons, there is no genuine dispute of material fact as to Joe's disparate treatment claims against Defendants.

### 3. Failure to Accommodate (Single Motive)

As part of his religious discrimination claims, Joe also asserts that Defendants failed to accommodate his opposition to Defendants' charitable contribution practices. As in any religious accommodation case alleging a failure to accommodate, this Court "begins with the question of whether the employee has established a prima facie case of religious discrimination." *Tepper*, 505 F.3d at 514 (quoting *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987)). Here, that means that Joe must show that "(1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement." *Id*. (quoting *Smith*, 827 F.2d at 1085). If an employee establishes a prima facie case, then the burden shifts to the employer "to show that it could not reasonably accommodate the employee without undue hardship." *Virts v. Consol. Freightways Corp. of Delaware*, 285 F.3d 508, 516 (6th Cir. 2002) (citations omitted).

23

Unlike his disparate treatment claim, Joe cannot establish a prima facie case of religious discrimination for failure to accommodate. The stumbling block here is that Joe has not shown that the Charitable Charter or the tithing practice are employment requirements—let alone requirements that were imposed on him in conflict with a sincerely-held belief.

Take first, the Charitable Charter. The Charitable Charter refers to a document that Tony Maas circulated near December 21, 2016. Byrne Decl., Ex. 24, Doc. 98-24, PageID 3229–31. The document is unambiguously religious, and it affirms that Defendants "believe that tithing is a critical part of our walking out our Catholic faith thus we tithe." *Id.* at PageID 3230. The document is signed by Tony, Jack, and Jerry, and their children. *Id.* at PageID 3231. Joe and his children did not sign—yet Joe remained employed at JTM for more than four years *after* the document was memorialized. Joe's son, Kevin, who also did not sign, was also employed at JTM at least as of January 24, 2019. Given these facts, Joe has not shown that the Charitable Charter qualifies as an employment requirement.

Joe next claims that JTM's charitable contributions are a forced tithe that qualifies as an employment requirement. *See* Joe Maas 8/11/22 Dep., Doc. 82, 352:12–13 ("They're taking my money. And they give it to charities."). This is not the case. Like the Charitable Charter, Joe has offered no evidence to support his assertion that the tithe is an employment requirement. The tithe is related to the total charitable contributions affecting shareholder distributions. Baverman Decl., Ex. 37, Doc. 87-37, PageID 2757. To the extent that Joe is a minority shareholder (or at least qualified as such while he was still employed at JTM), the tithe was "imposed" on him in a legally valid manner as a shareholder—not because of any

24

religious belief or non-belief. [8] As the Ohio Court of Appeals observed in Joe's prior case, "[w]hen a person acquires shares in a corporation, he comes in to be ruled by the majority in interest, and as long as such majority acts within the scope of the powers conferred by the corporation, the voice of the majority is the voice of the corporation and all of the shareholders." *Maas v. Maas*, 2020-Ohio-5160, ¶ 88 (1st Dist.) (citing *Koos v. Cent. Ohio Cellular, Inc.*, 94 Ohio App.3d 579, 588 (8th Dist. 1994)). Joe has not shown the tithe to be an employment requirement.

Further, it is undisputed by the parties that, in February 2017, after Joe raised concern about the level of charitable contributions, the Maas Defendants and the Board accommodated Joe's opposition and "agreed to reduce the amount of charitable giving at JTM from 10% of the pretax profits to 2%" of the pretax profits. Doc. 90-1, ¶ 4 (citing Baverman Decl., Ex. 37, Doc. 87-37); Doc. 102-1, ¶ 4. Notably, it is also undisputed that "JTM's charitable giving rate remained at the 2% level for the remainder of [Joe's] employment with JTM." Doc. 90-1, ¶ 5 (citing Baverman Decl., Ex. 38, Doc. 87-38, PageID 2761); Doc. 102-1, ¶ 5. Apart from that, as Defendants emphasize, Joe is still a director and controls 25% of the JTM shares alongside Tony, Jack, and Jerry, thus terminating Joe "does not prevent him from voicing his opposition to JTM's corporate tithing." Doc. 90, PageID

---

[8] The parties dispute whether Joe is a minority shareholder of JTM. The Maas Defendants assert that "[a]ll of the shares of JTM that were once individually-owned by Joe Maas were transferred to his children and trusts," and that "[t]his is confirmed by the stock ledger of the company and the stock certificates themselves." Doc. 90, PageID 2859 n.3. However, Joe has provided K-1 statements that he received from JTM in 2018, 2019, 2020, and 2021. Joe Maas Decl., Ex. 27, Doc. 97-27; Ex. 28, Doc. 97-28; Ex. 29, 97-29; Ex. 30, 97-30. Those statements purport to show that Joe was a minority shareholder of JTM at 0.04% during the relevant period covered by the Amended Complaint. The Court thus finds there is a genuine dispute of material fact as to Joe's status as a minority shareholder. However, for reasons stated later in this opinion, this is not a determining factor in deciding whether any of his remaining claims survive summary judgment.

2864. Indeed, Joe admits that he remains a director of JTM with the right to vote on Board resolutions regarding JTM's charitable giving. Doc. 90-1, ¶ 21; Doc. 102-1, ¶ 21.

Absent an employment requirement which conflicts with a sincerely-held religious belief, Joe cannot substantiate a prima facie case of failure to accommodate. Thus, there is no genuine dispute of material fact as to Joe's failure to accommodate claims.

### ii. Retaliation

Turning to retaliation, Joe asserts that Defendants terminated him for opposing Defendants' religious convictions, namely tithing. Am. Compl., Doc. 29, ¶¶ 106, 131. This claim is, like the others, subject to the burden-shifting framework since Joe has offered no direct evidence of retaliation. Joe must first establish a prima facie case of retaliation by showing that (1) he engaged in a protected activity, (2) the protected activity was known to Defendants, (3) Defendants took adverse employment action against Joe, and (4) there is a sufficient causal connection between the protected activity and the adverse action. *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004). If he does so, then the burden shifts to Defendants to articulate a legitimate non-discriminatory reason for discharge. If successful, Joe once again must show that Defendants' reasons were a pretext for discrimination.

There are two ways for Joe to show protected activity, the first prong of the prima facie case: (1) the opposition clause or (2) the participation clause. *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012). Under the "opposition clause," it is unlawful for an employer to retaliate when an employee has "opposed any practice made an unlawful employment practice under [Title VII]." 42 U.S.C. § 2000e-3(a). On the other hand, under the "participation clause," it is unlawful for an employer to retaliate when an employee has "participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Id*.

Here, Joe's claims arise under the former. Doc. 102, PageID 3517.

In order to secure protection under the opposition clause, Joe must have had "a reasonable and good faith belief" that the practice he was opposing qualified as a Title VII violation. *Wasek*, 682 F.3d at 469. In other words, Joe did not "bear the entire risk that it is in fact lawful; he [] must only have [had] a good faith belief that the practice is unlawful." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989). Not all "opposition" activity, however, is protected by Title VII. *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 751 (6th Cir. 1986). To qualify, the employee "must make it clear that [he] is opposing discrimination against a protected class." *Scheske v. Univ. of Mich. Health Sys.*, 59 F. Supp. 3d 820, 827 (E.D. Mich. 2014) (citing *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 374 (6th Cir. 2013)); *see also Jenkins v. Regents of the Univ. of Mich. Health Sys.*, 763 F. App'x 545, 552 (6th Cir. 2019) (first alteration in original) (quoting *Braun*, 828 F.3d at 511) ("[G]eneral 'complaints to management' do not constitute protected activity when the plaintiff does not 'object[] to discriminatory conduct against [him] based on [his] membership in a protected class.'").

Here, Joe did not challenge the charitable giving program on the basis that it was an unlawful discriminatory practice under Title VII. Instead, the record establishes that Joe challenged its lawfulness because he believed that JTM's charitable contributions program had no "business purpose" and he resented Defendants for "taking [his] money." Joe Maas 8/11/22 Dep., Doc. 82, 352:12–15. When Joe engaged legal counsel in late-2016 to assess the legality of the charitable giving program, his counsel, in a letter, wrote: "Our understanding is that Joe has expressed his concerns to Tony regarding the level of contributions over the years, and Tony has disregarded Joe's genuine concerns. As a

27

shareholder of the corporation, Joe's view is that JTM's contribution of 9% of all profits is an excessive and detrimental level of charitable donation and that such high degree of charitable giving serves *no legitimate corporate purpose* at this time." Baverman Decl., Ex. 15, Doc. 87-15, PageID 2712 (emphasis added). True to his professed views, in a 2017 email that Joe sent discussing his lack of confidence in Tony, Joe complained about Tony spending "$2.2 million in 2016 for nonbusiness purposes (charitable giving) knowing the company was embarking on the $72 million plant expansion while borrowing to its maximum loan limit without any cash reserves." Joe Maas Decl., Ex. 11, Doc. 97-11, PageID 3074. And, in an email complaining about charitable giving in 2020, Joe wrote that "the vast majority of our charitable giving should somehow benefit the company." Baverman Decl., Ex. 31, Doc. 87-31, PageID 2746. This evidence shows that over time, Joe continued to oppose the program because it did not benefit the company—and not because he believed it was an unlawful discriminatory practice under Title VII.

Further, although Joe testified that he did not think someone else should be able to impose their religious beliefs on him through charitable giving, Joe agreed that some level of charitable giving is necessary for JTM's business and that a lesser donation percentage would be appropriate. Joe Maas 5/4/22 Dep., Doc. 81, 56:3–9, 58:10–24; 59:1–16. In other words, Joe did not entirely disagree with JTM's charitable contributions program. Rather, the main point of disagreement related to the amount of charitable giving that JTM had been engaged in. *Id.* at 58:10–24. The record also shows that Joe also did not base his opposition on the faith tradition of organizations on the receiving end of the donations—and instead focused on whether JTM had a business purpose for giving to those organizations. When asked about specific Catholic charities, Joe said: "There's great Catholic charities out there. I'm not

28

suggesting that all of them are bad. But I can't think of one right now that has a business purpose…" *Id.* at 64:1–16. None of this evidence shows that Joe objected based on his membership in a protected class. *Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35, 45 (6th Cir. 2009) (determining that plaintiff's complaints did not constitute protected activity where the complaints concerned general "work-related issues" and expressed that plaintiff was "simply unhappy with the manner in which [defendant] conducted business.").

Though the evidence shows that Joe had a reasonable and good-faith belief for opposing the charitable giving program from a *business* perspective, the record lacks evidence that shows Joe opposed the program because he believed it to be a discriminatory practice under Title VII. Further, although Joe alleges in his Amended Complaint that the charitable giving program was a symptom of a broader culture and atmosphere of religious discrimination, Joe can point to no specific evidence in the record that would give credence to these assertions such that there is a genuine dispute of material fact. As a result, Joe cannot show that he engaged in protected activity, which is necessary to make a prima facie case of retaliation. Defendants are therefore entitled to summary judgment.

**B. Defendants are entitled to summary judgment on Joe's ERISA claim (Count 3).**

The Court turns next to Joe's ERISA claim that he asserts against JTM and the Maas Defendants. Section 510 of ERISA makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [a benefit] plan." 29 U.S.C. § 1140; *Williams v. Graphic Packaging Int'l, Inc.*, 790 F. App'x 745, 754 (6th Cir. 2019) (noting that ERISA "prohibits employers from terminating, or otherwise discriminating against, employees who choose to exercise a benefit to which they are entitled

29

under their benefit plan"). Since its inception, the aim of § 510 has been to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested [plan] rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980).

There are two types of § 510 claims under prevailing Sixth Circuit jurisprudence: "(1) a 'retaliation' claim where adverse action is taken because a participant availed [him]self of an ERISA right; and (2) an 'interference claim' where adverse action is taken as interference with the attainment of a right under ERISA." *Hamilton v. Starcom Mediavest Grp., Inc.*, 522 F.3d 623, 627–28 (6th Cir. 2008) (citation omitted) (cleaned up). Here, Joe alleges both a retaliation claim and an interference claim. Am. Compl., Doc. 29, ¶¶ 114–23. In support of these claims, Joe does not offer any direct evidence. Thus, the traditional *McDonnell Douglas* burden-shifting framework applies. *Crawford v. TRW Auto. U.S. LLC*, 560 F.3d 607, 613–14 (6th Cir. 2009) (applying the *McDonnell Douglas* burden-shifting analysis to ERISA claims).

### 1. Retaliation

To state a prima facie case for retaliation, Joe must show that "(1) he was engaged in an activity that ERISA protects; (2) he suffered an adverse employment action; and (3) a causal link exists between his protected activity and [Defendants'] adverse action." *Williams*, 790 F. App'x at 754–55 (citing *Hamilton*, 522 F.3d at 628). Defendants do not contest that Joe satisfies the first two prongs of the prima facie case, so the Court will focus its efforts on whether a causal link exists between Joe's protected activity and his termination.

Joe's retaliation claim is predicated on the fact that Defendants allegedly "admitted in state court that one of the reasons for Joe's termination on February 12, 2021, was because of his request to withdraw funds from JTM's 401(k) ERISA Plan." Doc. 102, PageID 3522. The admission that Joe refers to here is a statement contained in a brief that Defendants filed in

one of the prior state court lawsuits. In that brief, Defendants described Joe's attempt to withdraw funds from the JTM 401(k) during the stock market plunge of March 2020, which was in the midst of the COVID-19 pandemic, as one of the "most egregious" of his disruptive actions. Byrne Decl., Ex. 45, Doc. 98-45, PageID 3318. Joe claims this qualifies as "an evidentiary admission which creates an issue of fact as to whether Joe's termination was in retaliation for withdrawing his funds from the JTM 401(k) ERISA plan." Doc. 102, PageID 3522.

The Court does not agree. In essence, Joe asks the Court to consider a statement made in a state-court brief to qualify as a binding judicial admission. As a general matter, district courts in the Sixth Circuit may consider a statement in a brief to be a binding judicial admission. However, "[i]n order to qualify as judicial admissions [in the Sixth Circuit], an attorney's statements must be deliberate, clear and unambiguous." *United States v. Burns*, 109 F. App'x 52, 58 (6th Cir. 2004); *accord Beasley v. Wells Fargo Bank, N.A. for Certificate Holders of Park Place Sec., Inc.*, 744 F. App'x 906, 914 (6th Cir. 2018). There is no direct admission in the legal brief to which Joe refers. Instead, Joe expects the Court to deduce a conclusive fact from one statement's placement within a subsection discussing reasons for his termination. A statement in a legal brief relating to a different lawsuit, which does not feature a direct admission on the matter at hand, is hardly "clear and unambiguous." As a result, this Court declines to exercise its discretion to consider the statement to be a judicial admission.

Joe does not offer any other evidence in support of his ERISA retaliation claim, nor does he dispute Defendants' well-taken assertion that the lag between when he requested to withdraw funds from JTM's 401(k) ERISA Plan in March 2020, and when Defendants terminated him in February 2021, "defeats any inference of causation." Doc. 90, PageID 2870

(collecting cases). Further, Defendants offer evidence that shows other employees requested and received funds at the same time as Joe, but none of those employees were terminated. *Id.* at PageID 2871. In fact, Joe concedes that he knew of at least two other people at JTM that asked to withdraw funds around the same time as him, and that "they were not terminated." Joe Maas 7/8/24 Dep., Doc. 83, 95:11–24. Because Joe has not cited any evidence beyond the alleged state-court admission and has failed to refute the evidence offered by Defendants, the Court finds that Joe has failed to produce evidence sufficient to show a genuine dispute of material fact as to his retaliation claim. This claim therefore fails as a matter of law.

### 2. Interference

To state a prima facie case for interference, Joe must demonstrate: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which [he] may become entitled." *Bailey v. U.S. Enrichment Corp.*, 530 F. App'x 471, 477 (6th Cir. 2013) (quoting *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (per curiam)). Here, Joe cannot state a prima facie case for ERISA interference.

As an initial matter, by all accounts, Joe has abandoned his claim for interference as he does not even address it, nor point to any evidence that would create a factual dispute as to this claim. *Brown*, 545 F. App'x at 372 ("This [Circuit's] jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). Instead, Joe focuses only on evidence that he believes "creates an issue of fact as to whether [his] termination was in retaliation for withdrawing his funds from the JTM 401(k) ERISA Plan." Doc. 102, PageID 3522. Nonetheless, with or without Joe, the Court still must decide whether Defendants are entitled to summary judgment because "the party moving for summary judgment must meet his

32

burden of production to prevail, regardless of whether the adverse party responds." *Bruin v. White*, No. 5:16-cv-105, 2021 WL 4303684, at *2 (W.D. Ky. Sept. 21, 2021) (citing *Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017)).

Here, Defendants have shown that Joe cannot state a prima facie case for interference because Joe cannot demonstrate that Defendants engaged in prohibited conduct when they amended the 401(k) Plan, nor that the amendment was taken for the purpose of interfering with Joe's rights. As the Sixth Circuit has observed, "[n]othing in § 510 or in the case law suggests that § 510 was designed to limit the discretion afforded employers in the creation or *amendment* of ERISA plans." *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 509 (6th Cir. 2004) (emphasis added). It is undisputed that the Maas Defendants, alongside the JTM Board, "voted to amend the plan, at the advice of JTM's ERISA counsel, to change the valuation date for distributions." Doc. 90-1, ¶ 13; Doc. 102-1, ¶ 13. It is also undisputed that the "amendment applied to every JTM employee who requested a distribution from the retirement fund from March 13, 2020 forward." *Id.* Given these undisputed facts, the Court finds there is no genuine dispute as to Joe's ERISA interference claim.

## C. Defendants are entitled to summary judgment on Joe's aiding and abetting claim (Count 7).

In his Amended Complaint, Joe also asserts a claim for aiding and abetting through conspiratorial actions in violation of O.R.C. § 4112.02. Am. Compl., Doc. 29, ¶ 141. This relates to Joe's state law discrimination and retaliation claims. Doc. 102, PageID 3529.

Under this statute, it is unlawful for "any person to aid, abet, incite, compel, or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, to obstruct or prevent any person from complying with this chapter or any order issued under it, or to attempt directly or indirectly to commit any act declared by this section to be an unlawful

discriminatory practice." O.R.C. § 4112.02(J). To aid and abet in violation of this statute, "a person must 'actively participate in, or otherwise facilitate, another's discriminatory act in violation of R.C. 4112.02.'" *Blagg v. S.T.O.F.F.E. Fed. Credit Union*, 2024-Ohio-2579, ¶ 97 (8th Dist.) (quoting *Martcheva v. Dayton Bd. Of Edn.*, 2021-Ohio-3524, ¶ 74 (2d. Dist.)). So when there is insufficient evidence to sustain the underlying discriminatory practice, an aiding and abetting claim must also fail. *See Messer v. Summa Health Sys.*, 2018-Ohio-372, ¶ 67 (9th Dist.).

Since the Court determined above that Joe failed to establish a genuine issue of material fact regarding his state-law claims for religious discrimination and retaliation, Defendants are entitled to judgment as a matter of law on this claim. *Childs v. Kroger Co.*, 222 N.E.3d 741, 782–83 (Ohio Ct. App. Aug. 3, 2023) (collecting cases and holding that a claim for aiding and abetting unlawful discrimination under § 4112.02(J) fails as a matter of law when the plaintiff fails to establish the underlying discrimination claims). Yet even if the underlying discriminatory practices survived, there is not enough evidence to carry this claim forward. Joe does not present even a scintilla of evidence of any "participation" or "influence." *See Blagg*, 2024-Ohio-2579, ¶¶ 97–99. Though he argues that "if a jury determines that one of the three Maas brothers did not directly commit a discriminatory act or retaliate against Joe, they may still be responsible for the damages Joe incurred for aiding and abetting the other Defendants' wrongful conduct," Doc. 102, PageID 3529–30, he does not offer any evidence in support of this bald assertion. Because "[a] district court has no duty to sift through the record in search of evidence to support a party's opposition to summary judgment," *Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010), the Court finds that Joe has failed to create a genuine issue of material fact. His claim fails as a matter of law.

**D. The Maas Defendants are entitled to summary judgment on Joe's breach of fiduciary duty claim (Count 9).**

Next, the Court considers Joe's breach of fiduciary duty claim. In the Amended Complaint, Joe alleges that his firing "constitutes a breach of fiduciary duty as there was no legitimate business purpose for his termination." Am. Compl., Doc. 29, ¶ 163. "Ohio courts have held that majority or controlling shareholders in a close corporation cannot terminate a minority shareholder-employee without a legitimate business purpose." *Est. of Millhon v. Millhon Clinic, Inc.*, 2007-Ohio-7153, ¶ 25. "An employee's inappropriate behavior toward other employees is a legitimate business reason for termination in the context of a close corporation." *Duggan v. Orthopedic Inst. of Ohio, Inc.*, 365 F. Supp. 2d 853, 865 (N.D. Ohio 2005). *See, e.g.*, *Priebe v. O'Malley*, 89 Ohio App. 3d 8, 12 (9th Dist. 1993) (finding that majority shareholders had legitimate business reasons for terminating a shareholder which included the reason that the shareholder "was not working well with other employees").

To reiterate an earlier point, the parties dispute whether Joe is a minority shareholder, and the Court finds there is a genuine dispute of material fact on this issue. *See* Doc. 90, PageID 2859 n.3; Joe Maas Decl., Ex. 27, Doc. 97-27; Ex. 28, Doc. 97-28; Ex. 29, 97-29; Ex. 30, 97-30. However, even if the Court were to assume that Joe is a minority shareholder, Joe cannot prevail on his breach of fiduciary duty claim against the Maas Defendants.

As to his termination, the Maas Defendants produce numerous incidents of Joe exhibiting inappropriate behavior—often by way of company-wide email responses. Take for example, Joe's response to a company-wide email that Tony Maas sent wherein he shared a video made to commemorate Jack Maas Senior's induction into the Greater Cincinnati Hall of Fame. In a response sent to *the entire company*, Joe said, "If we were a family we would be a family owned business. We quit being a family owned business a while ago. Dad would be

ashamed." Baverman Decl., Ex. 25, Doc. 87-25, PageID 2736. On another occasion, when the Board decided to hire a new Vice President of Engineering, replacing Joe, Joe emailed *the entire company* venting his dismay and stating, "I strongly oppose this decision." *Id.* at Ex. 23, Doc. 87-23, PageID 2734.

The Maas Defendants also cite to some of Joe's other email communications. When the new VP of Engineering emailed Joe requesting routine tasks and documents related to the water treatment system, Joe responded, "I have been here 50 years, you have been here a few months. I have designed the process to produce the food JTM sells. Why would you insult my intelligence and my competency?" *Id.* at Ex. 26, Doc. 87-26, PageID 2739. Also, in an email to the members of the board of directors following the decision to hire a new Chief Financial Officer, Joe said "[t]he level of immorality of decisions by the board continue to shock me." *Id.* at Ex. 29, Doc. 87-29, PageID 2744. And in a different email sent to Tony Maas, CEO, Joe said, "You can turn off the entire company email box but you cannot turn off the disdain employees have for you, the disgust the employees have for the board and the love they have for me." *Id.* at Ex. 36, Doc. 87-36, PageID 2756. These are a few examples of unprofessional emails that Joe sent. Beyond this, the record is filled with testimony that addresses his lack of cooperation with other senior members of the company in completing critical projects and tasks. *See*, *e.g.*, Jerry Maas 3/22/22 Dep., Doc. 77, 190:12–13 ("He didn't just shirk his responsibilities. He mocked. He did everything besides help."); Sykes Dep., Doc 86, 165:14–166:13 (Joe "refused to" participate).

Joe does not dispute these facts. Instead, he argues that the true reason for his discharge was religious discrimination, which is not a legitimate business purpose. At any rate, in light of the evidence above, which shows inappropriate behavior toward other employees, Joe's

attempt at a diversion does not hold water. Thus, the record is such that no reasonable jury could find that the Maas Defendants, as majority shareholders, lacked legitimate business reasons for terminating Joe. Thus, they are entitled to summary judgment on this claim.

### E. Defendants are entitled to summary judgment on Joe's state law civil conspiracy claim (Count 11).

In his Amended Complaint, Joe also asserts a state law civil conspiracy claim, alleging that Defendants "have maliciously combined to cause injury to Joe by conspiring to breach their fiduciary duty to him as a minority shareholder." Am. Compl., Doc. 29, ¶ 171. Ohio law provides that "[i]f the substantive claim [] on which the civil-conspiracy claim is based, [has] no merit, the civil-conspiracy claim also lacks merit." *Smiddy v. Kinko's, Inc.*, 2003-Ohio-446, ¶ 18 (1st Dist.). Here, because Joe's breach of fiduciary duty claim has no merit, Joe's civil conspiracy claim suffers the same fate. Even so, had this claim been able to survive, "there must [also] be actual damages attributable to the conspiracy in addition to those damages caused by the underlying tort in order for the plaintiff to recover for the conspiracy." *Crosby v. Beam*, 83 Ohio App. 3d 501, 515–16 (6th Dist. 1992). Joe's civil conspiracy claim lists exactly the same damages as the breach of fiduciary duty claim. Am. Compl., Doc 29, ¶¶ 164, 172. He lists no damages specifically deriving from the alleged conspiracy. And "[s]ince there were no actual damages alleged with respect to the cause of action for conspiracy to commit a breach of fiduciary duty," summary judgment is proper. *Crosby*, 83 Ohio App. 3d at 516.

### F. Defendants are entitled to summary judgment on Joe's wrongful discharge claim (Count 12).

In Count 12, Joe alleges that his "termination was in retaliation for his consultation with counsel on February 11, 2021 regarding [his] employment and JTM's business matters."

Am. Compl., Doc. 29, ¶ 180. Based on these allegations, Joe asserts a claim for wrongful discharge in violation of public policy. In Ohio, "it is repugnant to the public policy of this state for employers to terminate employees for exercising their right to consult a lawyer." *Chapman v. Adia Servs., Inc.*, 116 Ohio App. 3d 534, 544 (1st Dist. 1997). Here, however, no reasonable jury could find that Defendants fired Joe because he consulted an attorney.

To prevail on his claim for wrongful termination in violation of public policy, Joe must offer evidence proving these elements: "(1) the existence of a clear public policy manifested in constitutional, statutory, regulatory, or common law; (2) the circumstances of the discharge undermine or jeopardize the public policy; (3) the discharge was for reasons related to the policy; and (4) there was no overriding legitimate basis for the discharge." *Krickler v. City of Brooklyn*, 2002-Ohio-4278, ¶ 13 (8th Dist.). These four elements are more commonly (and succinctly) referred to as (1) the clarity element, (2) the jeopardy element, (3) the causation element, and (4) the overriding justification element. *Chapman*, 116 Ohio App. 3d at 541.

Here, Defendants do not dispute that Joe has satisfied the first two elements: clarity and jeopardy. Doc. 90, PageID 2874. Thus, only the third and fourth elements—causation and overriding justification—are at issue. Joe is correct that, unlike the first two elements which are questions of law and policy, the third and fourth elements "are questions of fact to be determined by the trier of fact." *Chapman*, 116 Ohio App. 3d at 542. However, at this stage, the Court must still consider whether Joe has "presented sufficient evidence on the causation and justification elements to survive a motion for summary judgment." *Id.*

The relevant facts show that Joe consulted an attorney after receiving an offer on February 6, 2021, which would require him to resign from JTM. Joe Maas Dep., Doc. 97, ¶¶ 33–34. On February 11, 2021, Mark Byrne, Joe's legal counsel, informed Defendants that

Joe was refusing to resign and that Joe had asked him to review the proposed Separation Agreement. Baverman Decl., Ex. 47, Doc. 87-47, PageID 2798. JTM terminated Joe on February 12, 2021. *Id.* at Ex. 48, Doc. 87-48, PageID 2799–2800. As the only support for his wrongful termination claim, Joe makes the bald assertion that the timing of his termination the day after his attorney contacted Defendants, is enough evidence to create a genuine dispute for trial that Defendants wrongfully terminated Joe in violation of public policy because he consulted an attorney.

When viewed in a vacuum, this argument may seem compelling. But other evidence in the record undermines Joe's position. For example, the record shows that Jerry and Tony discussed plans to terminate Joe as early as January 1, 2021, before any of those events. *See* Jerry Maas 3/22/22 Dep., Doc. 77, 73:8–25. And notably, the proposed Separation Agreement also explicitly advised Joe to consult an attorney, and attorney Mark Byrne acknowledged this fact in his email to Defendants. Baverman Decl., Ex. 47, Doc. 87-47, PageID 2798. Joe's position is even weaker because he had consulted attorneys on numerous occasions well before this exchange and even sued Defendants without being terminated. *See generally*, *Maas v. Maas*, 2020-Ohio-5160 (1st Dist.). Beyond his conclusory assertion that timing alone shows causation, there is nothing in the record to support his assertion that he was discharged for reasons related to the public policy.

Joe's reliance on the facts in *Chapman* does not advance his claim. In *Chapman*, a case involving wrongful termination in violation of public policy, the defendant-employer claimed that it was entitled to summary judgment because the plaintiff was "not fired because she consulted a lawyer [], but because she might bring a lawsuit." *Chapman*, 116 Ohio App. 3d at 540. There the court "perceive[d] no difference," and found as a result, that the defendant-

39

employer had precluded plaintiff "from consulting an attorney about a potential claim [which] slammed the courthouse door shut and barred her opportunity to redress an alleged wrongdoing." *Id.* at 540, 544. Unlike *Chapman*, Joe cannot point to any statements made by Defendants, wherein they admit that Joe was terminated because he consulted with an attorney or because he was likely to file a lawsuit. Though *Chapman* stands for the clear proposition that Ohio law does not permit a person to be fired *solely* for consulting an attorney, Joe has failed to offer specific facts that show a genuine issue for trial. His conclusory allegations are not enough to survive summary judgment. *See Anderson*, 477 U.S. at 248 (a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial"); *Bryant v. Kentucky*, 490 F.2d 1273, 1275 (6th Cir. 1974) (conclusory allegations, without more, are not enough to survive summary judgment).

**G. Joe is not entitled to declaratory judgment (Count 13).**

That brings the Court to Joe's final claim for declaratory judgment. As part of his declaratory judgment claim, Joe wishes for the Court to declare that he is "entitled to enter onto real estate for which he is a partial owner." Am. Compl., Doc. 29, ¶ 185.

Here, the evidence and undisputed facts show that (1) Joe owns or controls 25% of Maas Enterprises (Joe Maas Decl., Doc. 97, ¶ 49), (2) Maas Enterprises is a limited liability company (Doc. 90-1, ¶ 22; Doc. 102-1, ¶ 22), and (3) Maas Enterprises owns the property on which JTM facilities are located (Joe Maas Decl., Ex. 31, Doc. 97-31). So, the question is: does Joe's partial ownership of an LLC make him a partial owner of real estate owned by the LLC?

According to the Supreme Court of Ohio, "[n]o ownership rights to…real property are granted to… a limited partner by any provision of [O.]R.C. Chapter 1782." *Lakeside Ave. L.P. v. Cuyahoga Cty. Bd. of Revision*, 85 Ohio St. 3d 125, 127 (1999). More to the point, a membership interest in an LLC is mere personal property and is distinct from the LLC's ownership of real property. *See Bd. of Educ. of the Whitehall City Sch. Dist. v. Franklin Cnty. Bd. of Revision*, 2002-Ohio-1256, *3–4 (10th Dist.). Accordingly, Joe Maas's ownership of 25% of Maas Enterprises, LLC confers no rights to real property owned by Maas Enterprises, LLC. The Court denies Joe's request for declaratory judgment to enter onto real estate he does not own.

## IV. CONCLUSION

For the reasons stated, JTM's Motion for Summary Judgment (Doc. 89) is **GRANTED IN PART** and **DENIED IN PART** and the Maas Defendants' Motion for Summary Judgment (Doc. 90) is **GRANTED** in its entirety. All of Joe's claims are **DISMISSED WITH PREJUDICE** except for Joe's mixed-motive Title VII religious discrimination claim against JTM. The Court will address Joe's Motion for Summary Judgment (Doc. 91) as it relates to any remaining affirmative defenses in a separate order.

**IT IS SO ORDERED.**

January 16, 2026

Jeffery P. Hopkins
United States District Judge